## STATE OF CONNECTICUT v. DANIEL WEBB
## (SC 14409)

McDonald, C. J., and Borden, Norcott, Katz, Palmer, Sullivan and Callahan, Js.

Argued October 28, 1999—officially released February 15, 2000

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Rosita M. Creamer* and *Dennis J. O'Con-*

*nor*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

MCDONALD, C. J. In *State* v. *Webb*, 238 Conn. 389, 680 A.2d 147 (1996), we affirmed the defendant's conviction and sentence of death for the crime of capital felony. We remanded the case to the trial court, however, for a hearing concerning the validity under the state constitution of lethal injection as a means of execution. We retained jurisdiction. Id., 551. After an evidentiary hearing, the trial court, *Fasano, J.*, denied the defendant's constitutional challenge to General Statutes § 54-100,[1] which establishes lethal injection as the state's present method of execution. The defendant appealed from the judgment of the trial court to this court. In the present appeal, we must decide whether lethal injection constitutes cruel and unusual punishment under the state and federal constitutions.[2] We affirm the judgment of the trial court.

The procedural posture of this case prior to our remand was set forth in *State* v. *Webb*, supra, 238 Conn. 392–401. "In June, 1991, the defendant, Daniel Webb, was tried before a jury on charges of capital felony, murder, felony murder, kidnapping in the first degree, criminal attempt to commit sexual assault in the first degree, and criminal possession of a pistol or revolver.

[1] General Statutes § 54-100 provides in relevant part: "(a) The method of inflicting the punishment of death shall be by continuous intravenous injection of a substance or substances in a quantity sufficient to cause death, in accordance with procedures prescribed by the Commissioner of Correction in consultation with the Commissioner of Public Health. . . ."

[2] Although our remand in *State* v. *Webb*, supra, 238 Conn. 389, was limited to a state constitutional issue and accordingly, the trial court did not address any federal constitutional issue, the defendant now argues that execution by lethal injection violates both the state and federal constitutions. The defendant maintains that this court improperly limited the remand to a state constitutional challenge. Notwithstanding our remand, we will address both the defendant's state and federal constitutional arguments.

The jury returned a verdict of guilty on all counts. In July, 1991, the trial court conducted a separate sentencing hearing, pursuant to General Statutes § 53a-46a,[3] before the same jury. The jury returned a special verdict finding that the state had proved two aggravating factors beyond a reasonable doubt, and that the defendant had not proved a mitigating factor by a preponderance of the evidence. After the trial court, *Corrigan, J.*, rendered its judgment of conviction in accordance with the jury's verdict, and imposed on the defendant a sentence of death by electrocution, th[e] [defendant's] appeal followed. . . . We affirm[ed] the defendant's conviction on all counts. We also affirm[ed] the imposition of the sentence of death." Id., 394–96.

Subsequent to the defendant's conviction and sentencing but prior to our decision, the legislature amended § 54-100,[4] changing the method of capital pun-

[3] General Statutes § 53a-46a provides in relevant part: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, and any aggravating factor set forth in subsection (i). Such hearing shall not be held if the state stipulates that none of the aggravating factors set forth in subsection (i) of this section exists or that any factor set forth in subsection (h) exists. Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause, or (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state. . . ."

[4] Public Acts 1995, No. 95-16, § 1, which amended § 54-100, provides: "Section 54-100 of the general statutes is repealed and the following is substituted in lieu thereof:

"The method of inflicting the punishment of death shall be by [electrocution] CONTINUOUS INTRAVENOUS INJECTION OF A SUBSTANCE OR

ishment from death by electrocution to death by lethal injection. On July 23, 1997, the department of correction (department) approved its lethal injection execution protocol, directive 6.15 (protocol).[5] Because the defen-

SUBSTANCES IN A QUANTITY SUFFICIENT TO CAUSE DEATH, IN ACCORDANCE WITH PROCEDURES PRESCRIBED BY THE COMMISSIONER OF CORRECTION IN CONSULTATION WITH THE COMMISSIONER OF PUBLIC HEALTH AND ADDICTION SERVICES. The [warden of the Connecticut Correctional Institution, Somers, is directed] COMMISSIONER SHALL DIRECT A WARDEN OF AN APPROPRIATE CORRECTIONAL INSTITUTION to appoint a suitable person to perform the duty of executing sentences of the court requiring the infliction of the death penalty. Such person shall receive, for such duty, such compensation as is determined by the [directors of the Connecticut Correctional Institution, Somers] COMMISSIONER. When any person is sentenced TO DEATH by any court of this state having competent jurisdiction, [to be electrocuted,] he shall, within twenty days after final sentence, be conveyed to [the Connecticut Correctional Institution, Somers,] AN APPROPRIATE CORRECTIONAL INSTITUTION and such punishment shall be inflicted only within the walls of said institution, [in Somers,] within an enclosure to be prepared for that purpose under direction of the warden of [the Connecticut Correctional Institution, Somers, and the board of directors thereof, which] SAID INSTITUTION. SUCH enclosure shall be so constructed as to exclude public view. Besides the warden or deputy warden and such number of [guards] CORRECTION OFFICERS as he thinks necessary, the following persons may be present at the execution, but no others: The sheriff of the county in which the prisoner was tried and convicted, the [board of directors, the] COMMISSIONER, A physician of [the Connecticut Correctional Institution, Somers, the] A CORRECTIONAL INSTITUTION, A clergyman in attendance upon the prisoner and such other adults, as the prisoner may designate, not exceeding three in number, representatives of not more than five newspapers in the county where the crime was committed, and one reporter for each of the daily newspapers published in the city of Hartford."

[5] Administrative directive 6.15 of the department of correction provides in relevant part:

"9. 30 Minutes Prior to the Execution. The following shall be initiated 30 minutes prior to the execution. . . .

"D. A person or persons, properly trained to the satisfaction of a Connecticut licensed and practicing physician, shall establish intravenous access. A primary intravenous infusion line shall be inserted in the left arm with a line inserted in the right arm as an alternative. . . .

"11. Execution Procedure. Execution procedures shall be as follows
. . . .

"D. . . . Administration of the lethal substance shall entail the administration of three (3) substances in a three (3) step process.

dant sought the opportunity to challenge the constitutionality of execution by lethal injection, we remanded the case to the trial court for a hearing as to that issue.

The trial court, *Fasano, J.*, on remand, conducted an evidentiary hearing concerning the constitutionality of the department's protocol as well as the constitutionality of death by lethal injection, generally. The defendant offered testimony from the following witnesses at the hearing: Peter Matos and Jack Tokozn, deputy commissioners of correction, who were responsible for organizing and assembling the task force that ultimately formulated the protocol; Bret Rayford, a psychologist, who screened department employees who would participate in the procedure; Thomas Macura, a pharmacist, who was responsible for developing the process and selecting the chemical agents used in lethal injection; Edward Blanchette, a physician, who would be responsible for the certification of death subsequent to any execution by lethal injection; and Edward Brunner, an anesthesiologist, who testified to the risks associated with the method of lethal injection dictated by the protocol.[6] The state offered testimony from Jeffrey Gross, an anesthesiologist, who testified regarding the amount of pain to a defendant who is subject to execution

"1. Step One. The first step shall require the administration of 2,500 milligrams (mg) of Thiopental Sodium (a lethal dose), in 50 ml of clear (without visible precipitate) Sodium Chloride 0.9% solution of an approximate concentration of 50 mg/ml or 5%.

"2. Step Two. The second step shall require the administration of 100 milligrams (mg) of Pancuronium Bromide (contents of ten [10] 5 ml vials of 2 mg/ml concentration) in 50 ml.

"3. Step Three. The third and final step shall require the administration of 120 milliequivalent (mEq) of Potassium Chloride (contents of two [2] 30 ml vials of 2 mEq/ml concentration) in 60 ml. . . ."

[6] The defendant offered the transcript of Brunner's testimony, which had originally been presented as live testimony during a similar hearing, challenging the constitutionality of execution by lethal injection, in *State* v. *Breton,* Superior Court, judicial district of Waterbury, Docket No. CR4-147941 (November 14, 1997), held before the same trial judge.

by lethal injection under the protocol, the safeguards included in the protocol, and the skill and training necessary successfully to carry out the procedure.

According to Matos, state officials conferred with officials of at least six other states that employed lethal injection. The state ultimately selected a manifold system for the administration of the agents. Although other states utilize a manual process, which requires that each chemical agent be administered individually through separate syringes, the task force selected the manifold system because that system minimized the potential for problems associated with the administration of the agents. The manifold locks the agents in a particular order and, as a result, eliminates the risk of inserting a syringe in an improper sequence. Matos also described the type of catheter selected by the state, which was designed and intended for delivering fluids sequentially and rapidly.

Brunner and Gross testified about each chemical agent prescribed by the protocol, the effect of those agents and the result of introducing those agents in the dosage and order prescribed by the protocol. The first agent, thiopental sodium, typically induces a state of unconsciousness through depression of the central nervous system. The protocol prescribes 2500 milligrams of thiopental sodium. This dosage of thiopental sodium is approximately nine times the typical dosage for surgery for an individual weighing 150 pounds, and would take effect within fifteen to twenty seconds and then dissipate after five to seven minutes. Because the effect of thiopental sodium varies from person to person, there is no known lethal dosage. The second agent, pancuronium bromide, causes skeletal muscle relaxation, in essence, paralysis. The protocol prescribes 100 milligrams of pancuronium bromide. This dosage of pancuronium bromide is approximately ten times the normal dosage and would take effect within two

minutes. The third agent, potassium chloride, is intended to cause a decrease in blood pressure, shock, cardiac arrhythmia and complete heart blockage. The protocol prescribes 120 milliequivalent of potassium chloride, a lethal dose, which would stop the heart instantly. Both anesthesiologists concluded that, if properly administered, the combination of agents together with the prescribed dosage would result in a quick, painless death.

The protocol requires the insertion of the intravenous catheter by persons trained to the satisfaction of a Connecticut licensed and practicing physician. See footnote 5 of this opinion. According to Matos, the state intends to employ either emergency medical technicians, paramedics or nurses to insert the intravenous catheter and administer the agents. At a minimum, therefore, those employed by the state previously will have demonstrated or previously will have acquired certification in obtaining intravenous access. Gross testified that the procedure is commonly taught to lay people in advanced life support courses, which many emergency medical technicians and paramedics complete.

After the hearing, the trial court denied the defendant's state constitutional challenge to Connecticut's method of execution by lethal injection. The trial court, recognizing that the state constitution does not contain a specific prohibition against cruel and unusual punishment, addressed the defendant's arguments on due process grounds. Relying on its previous decision in *State* v. *Breton*, Superior Court, judicial district of Waterbury, Docket No. CR4-147941 (November 14, 1997), the court concluded that the defendant had failed to satisfy his burden of proving § 54-100 unconstitutional. The trial court also rejected the defendant's other arguments. As to the defendant's argument, that using or incorporating medical procedures for the purpose of killing inmates is so abhorrent and shocking to the conscience as to

constitute a violation of substantive due process, the trial court reasoned that the employment of tested procedures used in the practice of medicine is consistent with the purpose behind the imposition of death by lethal injection, which is to impose death in as humane a manner as possible.[7] The trial court also rejected the defendant's argument that § 54-100 is unconstitutionally vague on its face because it provides no notice to the inmate as to the specific procedures for carrying out the sentence of death or any opportunity to challenge the method because of the ability of the commissioner of correction to change the procedures of execution. The trial court noted the lack of authority to support the proposition that the legislature constitutionally was required to provide the defendant with any detailed form of notice with respect to the procedures of execution. Finally, the trial court declined to address the defendant's argument that § 54-100 violates the state's separation of powers doctrine, reasoning that that claim was beyond the scope of the remand from this court.

On appeal, the defendant argues that execution by lethal injection constitutes cruel and unusual punishment under both the state and federal constitutions because the protocol developed by the commissioner of correction carries an unacceptably high risk that the execution procedure will be "botched." The defendant argues that there is a high risk that the defendant will experience excruciating pain and a lingering death because the protocol: (1) does not require that the procedures be administered by highly trained medical professionals; (2) does not ensure that a sufficient amount

---

[7] The legislative history indicates, inter alia, that the purpose behind the change from electrocution to lethal injection was that lethal injection is more humane. The amendment "would allow for lethal injection and take away electrocution, which is more humane . . . . There is no fiscal impact and it will be easier to administer and [is] basically a more humane type of treatment . . . ." 38 S. Proc., Pt. 3, 1995 Sess., p. 812, remarks of Senator Thomas F. Upson.

of thiopental sodium will be administered to render the defendant unconscious; (3) does not require that the agents be administered in a timely manner, in the correct order and with sufficient precautions to prevent them from mixing during the injection; (4) does not ensure that proper intravenous connections will be established; (5) does not require that the intravenous lines be flushed to prevent clogging; and (6) does not allow the defendant sufficient time to digest his last meal, thereby increasing the chances that he will choke during the procedure. Furthermore, the defendant maintains that lethal injection offends society's standards of decency because (1) the legislature adopted the method of lethal injection for economic, rather than humane, reasons; (2) the medical profession opposes lethal injection; and (3) lethal injection offends evolving standards of decency and is inconsistent with human dignity.

The state responds that lethal injection is constitutional because it is the most humane method available for imposing capital punishment. The state further maintains that the defendant's argument regarding the implementation of the execution process is irrelevant to this court's determination of the constitutionality of the method utilized by the state. The underlying details of the protocol, the state contends, are assigned to the executive branch. The state further contends that the evidence introduced by the defendant at the evidentiary hearings was overwhelmingly in support of the trial court's determination that the state's protocol prescribing lethal injection as the method of capital punishment is constitutional.

Whether the trial court properly concluded that lethal injection does not constitute cruel and unusual punishment is a mixed question of law and fact subject to independent review by this court. See *Campbell* v. *Wood*, 18 F.3d 662, 681 (9th Cir. 1994) (Washington's

method of execution, hanging, ruled constitutional). Although a trial court's factual findings are customarily subject to a clearly erroneous standard of review, the constitutional implications involved and the nature of the determination in any death penalty case require us to undertake an independent and scrupulous examination of the entire record to ascertain whether the trial court's conclusions with respect to the constitutionality of the method of execution are supported by substantial evidence. *State* v. *Ross*, 230 Conn. 183, 259, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); *State* v. *Medina*, 228 Conn. 281, 294, 636 A.2d 351 (1994). This court has plenary review of the trial court's conclusions of law; *State* v. *Velasco*, 248 Conn. 183, 189, 728 A.2d 493 (1999); and the ultimate question of the constitutionality of the method of execution. See *Fierro* v. *Gomez*, 77 F.3d 301, 306 (9th Cir.), vacated and remanded, 519 U.S. 918, 117 S. Ct. 285, 136 L. Ed. 2d 204 (1996), rev'd on other grounds sub nom. *Fierro* v. *Terhune*, 147 F.3d 1158 (9th Cir. 1998) (California's method of execution statute, lethal gas, ruled unconstitutional). We affirm the trial court's determination that death by lethal injection does not offend the state constitution. We also conclude that it does not offend the United States constitution.

## I

We first address the defendant's substantive argument that lethal injection likely will result in cruel and unusual punishment in violation of the eighth amendment to the United States constitution. The eighth amendment prohibits governmental imposition of "cruel and unusual punishments"; U.S. Const., amend. VIII; and bars "infliction of unnecessary pain in the execution of the death sentence." *Louisiana ex rel. Francis* v. *Resweber*, 329 U.S. 459, 464, 67 S. Ct. 374, 91 L. Ed. 422 (1947) (plurality opinion). A method of execution is viewed as cruel and unusual punishment

under the federal constitution when the procedure for execution creates a substantial risk of wanton and unnecessary infliction of pain, torture or lingering death. *Campbell* v. *Wood*, supra, 18 F.3d 683, citing *Louisana ex rel. Francis* v. *Resweber*, supra, 464; *Gregg* v. *Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (plurality opinion). When considering the constitutionality of a method of execution, courts must consider whether such method was considered cruel and unusual at the time that the bill of rights was adopted, as well as whether the method is contrary to the evolving standards of decency that mark the progress of a maturing society. *Trop* v. *Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (assessment of method of punishment under eighth amendment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society"). Because lethal injection did not exist as a method of execution when the bill of rights was adopted, we focus solely on the latter portion of the inquiry. See *Louisiana ex rel. Francis* v. *Resweber*, supra, 459.

The United States Supreme Court has not decided whether lethal injection violates the eighth amendment's prohibition against cruel and unusual punishment. That court, however, has addressed the constitutionality of other methods of execution. See *In re Kremmler*, 136 U.S. 436, 10 S. Ct. 930, 34 L. Ed. 519 (1890) (electrocution constitutional); *Wilkerson* v. *Utah*, 99 U.S. 130, 25 L. Ed. 345 (1878) (public shooting constitutional). In *Weems* v. *United States*, 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910), the court articulated a framework for addressing the constitutionality of a method of execution: (1) whether the method of execution comported with the contemporary norms and standards of society; (2) whether it offends the dignity of the prisoner and society; (3) whether it inflicted unnecessary physical pain; and (4) whether it inflicted unnec-

essary psychological suffering. In *Louisiana ex rel. Francis* v. *Resweber*, supra, 329 U.S. 459, the court used this framework to address the constitutionality of a second attempt at an electrocution after the first attempt failed to cause the inmate's death. The court rejected the defendant's argument that subjecting him to a second electrocution constituted cruel and unusual punishment: "The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution." Id., 464. "The cruelty against which the [c]onstitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely." Id. Since deciding *Louisiana ex rel. Francis* v. *Resweber*, supra, 459, the United States Supreme Court has not addressed the constitutionality of any method of execution.

Lower federal courts have considered the issue with respect to other means of execution. In *Campbell* v. *Wood*, supra, 18 F.3d 662, the Ninth Circuit Court of Appeals addressed, inter alia, the issue of whether execution by hanging violated the eighth amendment because it constituted cruel and unusual punishment. Recognizing the trend among several states to replace hanging with lethal injection, the court nonetheless held that hanging did not constitute cruel and unusual punishment. "We do not consider hanging to be cruel and unusual simply because it causes death, or because there may be some pain associated with death." Id., 683. The court concluded that execution by hanging, if properly implemented, did not involve the wanton and unnecessary infliction of pain. Id. The court focused upon the safeguards within the state of Washington's

protocol and concluded that, because of those factors, "unconsciousness was likely to be immediate or within a matter of seconds, and that death would follow rapidly thereafter." Id., 687.

In *Fierro* v. *Gomez*, supra, 77 F.3d 301, the Ninth Circuit Court of Appeals addressed the constitutionality of execution by lethal gas. Relying on *Campbell* v. *Wood*, supra, 18 F.3d 662, the court focused on whether execution by lethal gas involved the unnecessary and wanton infliction of pain. *Fierro* v. *Gomez*, supra, 307. Because of the trial court's finding that even if the mechanism of execution were implemented properly, there was a substantial risk that inmates would suffer extreme pain for several minutes, the court concluded that execution by lethal gas is cruel and unusual punishment. Id., 308.

This record fails to establish that there is any reason to infer that the protocol will not be administered properly. We focus our inquiry, therefore, on the objective evidence of the pain inherent in execution by lethal injection, and, having done so, we find that the trial court reasonably concluded that lethal injection does not constitute cruel and unusual punishment. Unlike the evidence in *Fierro*, there is no objective evidence in the present case indicating that unnecessary pain is inherent in execution by lethal injection.[8] On the basis of the testimony introduced regarding the agents utilized pursuant to the protocol and the corresponding dos-

---

[8] In *Fierro* v. *Gomez*, supra, 77 F.3d 301, the trial court heard evidence from several expert medical witnesses regarding lethal gas inhalation. "The execution records provided information regarding the exact time that certain events occur during the execution process. These events include the time that cyanide is released into the gas chamber, the time that the gas first strikes an inmate's face, the time that an inmate lapses into apparent unconsciousness . . . and the time of an inmate's last bodily movement." Id., 307. The trial court noted that the evidence was probative of the pain inherent in execution by lethal gas because the executions in the cases examined were conducted in accordance with the challenged protocol. Id.

ages, there simply is no reason to believe that the defendant would experience anything more than the insertion of the intravenous catheter followed by unconsciousness. In fact, the expert witnesses of the defendant and the state, both anesthesiologists, concluded that, if properly administered, the combination of agents coupled with the prescribed dosage would result in a quick and painless death. Because it is undisputed that a quick and painless death would result if the agents prescribed pursuant to the protocol were administered properly, we agree with the trial court that there is no cruelty inherent in the mechanism of execution as set forth in the protocol. Although the defendant introduced extensive testimony regarding the consequences associated with the potential for improper administration of the agents, "[t]he risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review." *Campbell* v. *Wood*, supra, 18 F.3d 687.

Although we conclude that the potential for improper administration of the agents is not relevant in the determination of whether the mechanism of execution is constitutional, we briefly will address the defendant's arguments regarding that potential. Those arguments center around the potential difficulty associated with the insertion of the intravenous catheter, and the administration and monitoring of the thiopental sodium. Specifically, the defendant argues that the protocol does not require that the personnel be trained adequately and be proficient in the insertion of intravenous catheters, and in the administration and monitoring of thiopental sodium. As a result, the defendant maintains there is an unacceptably high risk that the agents will not be administered properly. We disagree. The protocol requires the insertion of the intravenous catheter by persons properly trained to the satisfaction of a

Connecticut licensed and practicing physician. See footnote 5 of this opinion. The state intends to employ either emergency medical technicians, paramedics, or nurses, all trained to insert the intravenous catheter. The defendant has not offered any evidence to suggest that these persons, possessing the requisite training, would not be capable of inserting an intravenous catheter properly. To the contrary, the testimony established that obtaining intravenous access is a technical skill that, through proper training, becomes routine. Of course, the possibility exists that there could be some difficulty in inserting the catheter, however, we conclude that such a possibility does not render the method cruel and unusual punishment. "On the rare occasion when there is difficulty in locating a vein, more than a single needle insertion may be necessary. This is hardly the cruel and unusual punishment contemplated by the Eighth Amendment." *Hill* v. *Lockhart*, 791 F. Sup. 1388, 1394 (E. D. Ark. 1992). Furthermore, the protocol provides for an alternative intravenous insertion in the right arm as a safeguard in the event that there is a problem with intravenous access in the left arm. See footnote 5 of this opinion.

The defendant also argues that the administration and monitoring of the thiopental sodium, when performed by untrained personnel, leads to an unacceptably high risk that the agents will not be administered properly. The defendant's claim is premised on the testimony regarding the uncertainty of the appropriate dosage of thiopental sodium required for a medical procedure. Although the testimony indicated the variable dosages of thiopental sodium necessary in a medical setting, the circumstances surrounding an execution, namely the extreme dosage and ultimate objective, are unique to the execution process. Because of this, we cannot agree with the defendant's argument.

According to Macura, more skill in administering the drug is required in the medical setting because of the delicate balance between unconsciousness and death. The circumstances surrounding an execution do not require such a balance.

The defendant further argues that the protocol does not address critical factors in the proper administration of the agents, such as timing and sequence. We disagree. The manifold delivery system adopted by the state ensures proper administration of the agents. In fact, the manifold system was selected specifically to minimize the potential for improper administration. In addition, the catheter selected by the state was designed and intended for delivering fluids sequentially and rapidly.

The defendant's argument is premised on a series of presumptions: that the personnel will not be trained adequately; that the dosage of thiopental sodium ten times the surgical dosage will not be sufficient to render the inmate unconscious; and that the agents will not be administered in the proper time and sequence. The evidence, however, supports a conclusion that reasonable steps have been taken to eliminate human error. We cannot foreclose the possibility of human error, that always accompanies any human endeavor. We conclude, however, that the agents may be administered correctly and effectively, and that the possibility of a "botched" execution is extremely remote under the protocol. Furthermore, we agree with the court in *Campbell* v. *Wood*, supra, 18 F.3d 687, when it stated: "The risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review."

Last, the defendant argues that lethal injection is unconstitutional because it offends society's standards of decency. Other courts have looked at legislative trends as evidence of society's standards of decency

and attitude toward a particular method of execution. Of the thirty-eight states permitting capital punishment, at least thirty-four have adopted lethal injection as a manner of execution.[9] They have done so because it is universally recognized as the most humane method of execution, least apt to cause unnecessary pain. In addition, every court that has addressed this issue has concluded similarly that lethal injection is constitutional. See *Woolls* v. *McCotter*, 798 F.2d 695, 698 (5th Cir.), cert. denied, 478 U.S. 1031, 107 S. Ct. 15, 92 L. Ed. 2d 769 (1986); *Kelly* v. *Lynaugh*, 862 F.2d 1126, 1135 (5th Cir. 1988), cert. denied, 492 U.S. 925, 109 S. Ct. 3263,

---

[9] The states that currently authorize lethal injection for execution are: Arizona, Ariz. Rev. Stat. Ann. § 13-704 (West pocket part 1998); Arkansas, Ark. Code Ann. § 5-4-617 (Michie 1993); California, Cal. Penal Code § 3604 (Deering 1999); Colorado, Colo. Rev. Stat. Ann. § 16-11-401 (1999); Connecticut, General Statutes § 54-100; Delaware, Del. Code Ann. tit. 11, § 4209 (f) (Michie 1995); Idaho, Idaho Code § 19-2716 (Michie 1997); Illinois, 725 Ill. Comp. Stat. Ann. 5/119-5 (a) (1) (West pocket part 1999); Indiana, Ind. Stat. Ann. § 35-38-6-1 (Michie 1998); Kansas, Kan. Stat. Ann. § 22-4001 (1995); Kentucky, Ky. Rev. Stat. § 431.220 (Lexis Law Publishing pocket part 1998); Louisiana, La. Rev. Stat. Ann. § 15:569 B. (West 1992); Maryland, Md. Code Ann., Corr. § 3-905 (1999); Mississippi, Miss. Code Ann. 1972 § 99-19-51 (1994); Missouri, Mo. Rev. Stat. § 546.720 (1994); Montana, Mont. Code Ann. § 46-19-103 (1999); Nevada, Nev. Rev. Stat. § 176.355 1. (1997); New Hampshire, N.H. Rev. Stat. Ann. § 630:5 XIII. (Michie 1996); New Jersey, N.J. Stat. Ann. § 2C:49-2 (West 1995); New Mexico, N.M. Stat. Ann. § 31-14-11 (Michie 1994); New York, N.Y. Correct. Law § 658 (McKinney pocket part 1999); North Carolina, N.C. Gen. Stat. § 15-187 (Michie 1998); Ohio, Ohio Rev. Code Ann. § 2949.22 (B) (1) (West 1997); Oklahoma, Okla. Stat. Ann. tit. 22 § 1014 (West 1986); Oregon, Or. Rev. Stat. Ann. § 137.473 (1991); Pennsylvania, Pa. Stat. Ann. tit. 61 § 3004 (West 1999); South Carolina, S.C. Code § 24-3-530 (West Sup. 1998); South Dakota, S.D. Codified Laws § 23A-27A-32 (Michie 1998); Tennessee, Tenn. Code. Ann. § 40-23-114 (Lexis Law Publishing Sup. 1999); Texas, Texas Crim. P. Code Ann. § 43.14 (West 1999); Utah, Utah Code Ann. § 77-18-5.5 (Lexis Law Publishing 1999); Virginia, Va. Code § 53-1-233 (Michie 1998); Washington, Wash. Rev. Code Ann. § 10.95.180 (West pocket part 1999); and Wyoming, Wyo. Stat. Ann. § 7-13-904 (Lexis Law Publishing 1999). The United States government and the United States military also currently authorize lethal injection for executions. See 28 C.F.R. § 26.3 (4) (1999); *State* v. *Deputy*, 644 A.2d 411, 421 n.7 (Del. Super. 1994), citing Army Reg. 190-55, U.S. Army Correctional System: Procedures for Military Executions, para. 6-1 (October 27, 1986).

106 L. Ed. 2d 608 (1989); *Hill* v. *Lockhart*, supra, 791 F. Sup. 1394; *Felder* v. *Estelle*, 588 F. Sup. 664, 674 (S.D. Tex. 1984); *State* v. *Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602 (1995); *State* v. *Deputy*, 644 A.2d 411, 421 (Del. Super. 1994); *People* v. *Stewart*, 123 Ill. 2d 368, 386, 528 N.E.2d 631 (1988), cert. denied, 489 U.S. 1072, 109 S. Ct. 1356, 103 L. Ed. 2d 824 (1989); *State* v. *Moen*, 309 Or. 45, 98–99, 786 P.2d 111 (1990); *Hopkinson* v. *State*, 798 P.2d 1186, 1187 (Wyo. 1990). These legislative and judicial determinations are evidence of society's attitude toward lethal injection. Accordingly, we conclude that this particular method of execution does not offend current standards of decency and, thus, is constitutional under the federal constitution.

## II

We turn, therefore, to the defendant's argument that lethal injection will likely result in cruel and unusual punishment in violation of article first, §§ 8 and 9, of the constitution of Connecticut. Although our state constitution does not expressly prohibit cruel and unusual punishment, this court has held that our due process clauses implicitly prohibit punishment that is cruel and unusual. *State* v. *Ross*, supra, 230 Conn. 246.[10] Because "cruel and unusual" punishment is explicitly prohibited under the federal constitution, and we read our due process guarantees to implicitly prohibit such punishment, we adopt the federal standard, of whether the execution creates a substantial risk of the wanton and unnecessary infliction of pain, torture, or lingering death on the subject. "[W]e have frequently relied upon decisions of the United States Supreme Court interpre-

---

[10] In *State* v. *Ross*, supra, 230 Conn. 246–47, this court concluded that the due process guarantees contained in our state consitution impliedly prohibit punishment that is "cruel and unusual" because "[p]rior to the adoption of the state constitution in 1818, the common law in Connecticut recognized that the state did not have unlimited authority to inflict punishment for the commission of a crime."

ting the fourth amendment, as well as other amendments to the United States constitution, to define the contours of the protections provided in the various sections of the declaration of rights contained in our state constitution." (Internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992). Thus, we will rely on our federal constitutional analysis in part I of this opinion. Because we conclude that lethal injection is constitutional under the federal constitution, we similarly conclude that the method is constitutional under our state constitution.

The judgment is affirmed.

In this opinion BORDEN, PALMER, SULLIVAN and CALLAHAN, Js., concurred.

NORCOTT, J., dissenting. I believe that my opposition to the death penalty already has been sufficiently expressed. See *State* v. *Cobb*, 251 Conn. 285, 543, 743 A.2d 1 (1999) (*Norcott, J.*, dissenting); *State* v. *Webb*, 238 Conn. 389, 566, 680 A.2d 147 (1996) (*Norcott, J.*, dissenting). While my opposition constitutes only a minority position today, I am optimistic that very early in the twenty-first century we will all witness the abolition of this practice by Connecticut as a state and the United States as a country.

Accordingly, I once again dissent in the present case, where the inexorable conclusion to this criminal proceeding will be the execution of the defendant by the state of Connecticut.

KATZ, J., dissenting. I continue to believe that the death penalty fails to comport with contemporary standards of decency and thereby violates our state constitution's prohibition against cruel and unusual punishment. See Conn. Const., art. I, §§ 8 and 9. Accordingly, I would remand this case to the trial court with direction to vacate the penalty of death and to impose

a sentence of life imprisonment without the possibility of release. I believe, however, that I have a responsibility to speak out against the death penalty in every case in which this court reaffirms its position that the punishment of death meets contemporary and moral standards of decency.

As Justice Berdon stated so eloquently: "Whether a penalty constitutes cruel and unusual punishment depends in large part upon contemporary standards of decency. Unlike other constitutional precedents, this standard of review evolves and therefore the question must be evaluated in each case. I am confident that eventually both the judicial system and the citizens of this state will reflect back on this day with the same disbelief and sense of outrage that we currently hold in regard to those punishments that were inflicted during the eighteenth and nineteenth centuries in this state. The realization that the penalty of death fails to comport with contemporary standards of decency does not, however, depend upon the passage of time measured by centuries." *State* v. *Webb*, 238 Conn. 389, 552–53, 680 A.2d 147 (1996) (*Berdon, J.*, dissenting).

"Perhaps the most important principle in analyzing cruel and unusual punishment questions is one that is reiterated again and again in the prior opinions of the Court: i.e., the cruel and unusual language must draw its meaning from the evolving standards of decency that mark the progress of a maturing society. Thus, a penalty that was permissible at one time in our Nation's history is not necessarily permissible today.

"The fact, therefore, that the Court, or individual Justices, may have in the past expressed an opinion that the death penalty is constitutional is not now binding on us." (Internal quotation marks omitted.) *Furman* v.

*Georgia*, 408 U.S. 238, 329, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Marshall, J., concurring).[1]

"[A]s judges, we cannot eschew our individual responsibility for the death penalty that the court approves today simply because it is a legislative directive. We have a duty, as the final arbiters of the state constitution, to determine whether the punishment of death meets contemporary and moral standards of decency. If a penalty exceeds those bounds, as I believe the death penalty does, we have a constitutional obligation to declare it unconstitutional, just as we would if the legislature provided for punishment by the rack, the screw or the wheel." *State* v. *Webb*, supra, 238 Conn. 554 (*Berdon, J.*, dissenting).

Cruelty has been described as "total activity smashing total passivity." H. Bedau, "Thinking About the Death Penalty as Cruel and Unusual Punishment," 18 U.C. Davis L. Rev. 873, 917 (1985). The "power-relationship between two parties," one of whom, the executioner, is "active, comparatively powerful," and the other of whom, the condemned, is "passive, comparatively powerless," reveals the very essence of capital punishment. P. Hallie, Cruelty (1982) p. 34. "We have perfected the art of institutional killing to the degree that it has deadened our natural, quintessentially human response to death." S. Blaustein, "Witness to Another Execution,"

[1] Indeed, during his tenure on the United States Supreme Court, Justice Blackmun eventually acknowledged that the death penalty was imposed in an arbitrary, capricious and racist manner, and was therefore unconstitutional. He stated: "From this day forward, I no longer shall tinker with the machinery of death." *Callins* v. *Collins*, 510 U.S. 1141, 1145, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994) (Blackmun, J., dissenting). Similarly, after stepping down from the Supreme Court, Justice Powell's views on the subject evolved such that he came to believe that capital punishment should be abolished. Four years after his retirement from the United States Supreme Court, Justice Powell was quoted as saying: "I have come to think that capital punishment should be abolished." J. Jeffries, "A Change of Mind That Came Too Late," N.Y. Times, June 23, 1994, p. A23, col. 1.

Harper's, May, 1994, pp. 53, 62. I recognize that some methods of execution are worse than others, but none is better. H. Bedau, "Philosophical Perspectives— Imprisonment vs. Death: Does Avoiding Schwarz-schild's Paradox Lead to Sheleff's Dilemma?" 54 Alb. L. Rev. 481, 483 (1990). Therefore, whether carried out by impalement or electrocution, crucifixion or the gas chamber, firing squad or hanging, lethal injection or some other method yet to be designed, the very quintessence of capital punishment is cruelty. Although lethal injection may not disfigure the body, may not cause any pain,[2] and brings about death within a few minutes, and while the practice of death by lethal injection may not rise to the same level of indignity as some of the other methods of execution, it is no less cruel when viewed in the context of the power relationship previously described. See P. Hallie, supra, p. 34.

I recognize that the notion of another person being executed is offensive only when there is something of value being destroyed and that once a person has been convicted of a ghastly crime, he no longer falls into that category. Nevertheless, society should not have the authority to sustain an institution the nature of which is to destroy its own members. If our status as moral creatures is to survive, the termination of our ability to accomplish a deliberate institutionalized method of execution heads my list of desiderata for this society.

The issue for me is not whether the defendant who has committed such hideous atrocities has the right to life, but whether we as a society have the right to kill. Certainly the defendant did not have that right. But to give this "affirmation of the humanity"[3] of the defendant

---

[2] As Justice Norcott pointed out at oral argument, the problem with this assumption, of course, is that the only person who could tell us if this actually is true is no longer able to do so.

[3] E. van den Haag, "The Death Penalty Once More," 18 U.C. Davis L. Rev. 957, 972 (1985).

by treating him more or less the way he treated Diane Gellenbeck is, to me, bizarre. "The death penalty symbolizes unlimited impersonal power over the individual, with dramatically final and irreversible results whenever it is expressed. As long as we choose to hang this moral albatross around our necks, I see no way for us to enjoy, much less help the rest of the world to enjoy, the benefits of a truly human community." H. Bedau, "A Reply to van den Haag," in The Death Penalty in America: Current Controversies (H. Bedau ed. 1997) pp. 457, 469.

I respectfully dissent.