******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* EDUARDO SANTIAGO
(SC 17413)

The motion of the state of Connecticut, filed September 4, 2015, for argument, having been presented to the court, it is hereby ordered denied.

October 7, 2015

ROGERS, C. J., with whom ZARELLA and ESPINOSA, Js., join, dissenting from the denial of the state's motion for argument and reconsideration. In *State* v. *Santiago*, 318 Conn. 1,    A.3d    (2015), a majority of this court concluded that the death penalty is unconstitutional under the due process provisions of our state constitution after the legislature's prospective repeal of the death penalty in No. 12-5 of the 2012 Public Acts (P.A. 12-5). In reaching this conclusion, the majority, over the repeated objections of the dissenting justices, addressed numerous issues that the defendant, Eduardo Santiago, had not raised, and it relied on extra-record materials that the state had not had an opportunity to review or to respond to.[1] In addition, the majority relied heavily on testimony by Chief State's Attorney Kevin T. Kane that, in the majority's opinion, demonstrated that he believed that a prospective repeal would constitutionally invalidate the death penalty for any defendant who had not already been executed.[2] See id., 8 n.1. This purported reliance was nothing more than a facade: the courts alone decide the constitutionality of a law, not the state's attorneys. See *Marbury* v. *Madison*, 5 U.S. 137, 177, 2 L. Ed. 60 (1803) ("[i]t is emphatically the province and duty *of the judicial department* to say what the law is" [emphasis added]). Thus, the majority has overturned a democratically enacted law of great significance to the people of this state on the basis of claims that the defendant did not raise and extra-record materials that the state did not have an opportunity to review or to respond to, and on the basis of statements by state officials on a *constitutional* issue that this court had the exclusive constitutional duty to resolve. In addition, the majority, without any notice to the parties that it was considering such an action, and after having just reaffirmed this court's jurisprudence regarding the constitutionality of the death penalty under the state constitution *in this very case*, effectively overruled that jurisprudence.

After the decision in *Santiago* was published, the state filed a motion for argument and for reconsideration, signed by the very official on whose statements the majority so heavily relied, in which the state requested permission to file supplemental briefing and to present oral argument on the issues that it had not previously had an opportunity to address. In that motion, the state

identified specific arguments and information that it would have provided to this court if it had been on notice that the court would consider those issues in making its determination as to the constitutionality of the death penalty.[3] Thus, the state has emphatically confirmed the validity of the dissents' repeated warnings that the majority was going far beyond the narrow issues raised by the defendant in reaching its ultimate conclusion. In a final effort to conceal the embarrassing and now undeniable fact that the emperor has no clothes, the majority has denied the state's motion. I emphatically disagree. It is crystal clear to me that the most basic requirement of due process—the requirement for notice and a hearing—entitles the state to an opportunity to be heard on these matters. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 162–63, 84 A.3d 840 (2014) (reviewing "court may raise [a] claim sua sponte, as long as it provides an opportunity for all parties to be heard on the issue"); *Bloom* v. *Zoning Board of Appeals*, 233 Conn. 198, 205, 658 A.2d 559 (1995) ("[a] fundamental premise of due process is that a court cannot adjudicate any matter unless the parties have been given a reasonable opportunity to be heard on the issues involved"). At a bare minimum, the state is entitled to an explanation as to why the majority finds it unnecessary even to consider its arguments.

To the extent that the majority believes that it has already adequately explained in its opinion why it addressed issues that the defendant did not raise and relied on extra-record materials that the state had no opportunity to review, any such contention does not withstand scrutiny. The majority stated in its opinion that it could "only assume that this choice [not to brief these issues] represented a calculated decision, by both parties, that, with their briefs already taking up more than a ream of paper, resources—both natural and judicial—would be better addressed to the novel issues presented by the defendant's case, and that we had more than sufficient resources at our disposal to allow us to fully review the present constitutionality of capital punishment in a thorough and comprehensive manner." *State* v. *Santiago*, supra, 318 Conn. 122.

First, I begin with the obvious: the state has unequivocally represented in its motion that it had no idea that the majority would address issues that the defendant had not expressly raised or extra-record materials that neither party had cited, and that it would like the opportunity to address these issues for the first time now. We must, of course, assume that these representations are true. See Rules of Professional Conduct 3.3 (a) ("[a] lawyer shall not knowingly . . . [1] [m]ake a false statement of fact or law to a tribunal").

Second, there was absolutely nothing in the defendant's or the state's supplemental brief to suggest that the parties contemplated that the court would review *anything* except the defendant's narrow claims that

the enactment of P.A. 12-5 evinced a *newly emerged* societal consensus that the death penalty is no longer an appropriate punishment for the most egregious murders, that the death penalty no longer had any penological value after its prospective repeal, and that the effective date provision of P.A. 12-5 was arbitrary. The parties assumed that, if this court agreed with any of those narrow claims, the defendant would prevail and, if the court disagreed, the state would prevail. The parties did not assume, indeed, they could not have known, that this court would revisit and effectively overrule its entire jurisprudence regarding the constitutionality of the death penalty under the state constitution—which it had just reaffirmed *in this very case*—and that it would do so largely on the basis of claims that the defendant had not raised and extra-record materials that the parties had never seen. Thus, the majority's contention that the state made a *calculated decision* not to address issues that the defendant had not raised has absolutely no basis in fact.

Finally, the majority's statement that the state declined to brief these issues in its supplemental brief because it believed that this court "had more than sufficient resources at [its] disposal to allow [it] to fully review the present constitutionality of capital punishment in a thorough and comprehensive manner"; *State* v. *Santiago*, supra, 318 Conn. 122; without any input from the state suggests a lack of understanding of or respect for the adversarial system that is nothing short of astonishing.

Accordingly, since the majority does not want to hear the arguments that the state has to offer on these issues, I continue to maintain that the majority should have limited itself to addressing the narrow claims that the defendant actually raised, namely, that the legislature's enactment of P.A. 12-5, which abolished the death penalty effective April 25, 2012, rendered the death penalty unconstitutional because: (1) P.A. 12-5 embodied a *newly emerged* societal consensus that the death penalty is no longer an appropriate punishment for the most egregious murders; (2) the death penalty no longer has any penological value; and (3) the effective date provision was arbitrary.

If the majority had limited itself to these claims, the sole bases for its conclusion that the death penalty is unconstitutional would have been that: (1) the fact that thirty-six out of 184 legislators had expressed moral qualms about the death penalty during the legislative debate on P.A. 12-5 shows that the death penalty is inconsistent with contemporary societal mores in this state;[4] see *State* v. *Santiago*, supra, 318 Conn. 196 (*Rogers, C. J.*, dissenting); (2) P.A. 12-5 has completely eliminated the death penalty's deterrent value; id., 89; and (3) after the enactment of P.A. 12-5, the death penalty was not properly retributive, but was intended solely to exact vengeance against "two particular offenders—the much reviled perpetrators of the widely publicized

2007 home invasion and murder of three members of Cheshire's Petit family." Id., 116. When the majority's analysis is limited to these issues, the weakness of its ultimate conclusion is, in my view, self-evident. See id., 251–76 (*Rogers, C. J.*, dissenting). Indeed, if there was ever any doubt, it is now inescapably clear that the three main pillars of the majority's analysis have no foundation: Kane does not believe that the death penalty is now inconsistent with contemporary societal mores in this state; the moral qualms about the death penalty expressed by thirty-six legislators during the debate on P.A. 12-5 do not reflect the prevailing societal mores in this state; and the state did not make a calculated decision not to brief issues that the defendant did not raise, which constitute the bulk of the majority opinion.

In summary, the majority's refusal to consider the state's arguments on issues that it previously has not had an opportunity to address is simply inexplicable and cannot be justified under any fair and rational standard. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 146 ("we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of *matters the parties present*" [emphasis added]), quoting *Greenlaw* v. *United States*, 554 U.S. 237, 243, 128 S. Ct. 2559, 171 L. Ed. 2d 399 (2008); *State* v. *Webb*, 238 Conn. 389, 461, 680 A.2d 147 (1996) ("the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority" [internal quotation marks omitted]), aff'd after remand, 252 Conn. 128, 750 A.2d 448, cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000); see also *State* v. *Lenarz*, 301 Conn. 417, 454–55, 22 A.3d 536 (2011) (*Palmer, J.*, dissenting) ("[T]he majority devises its unprecedented methodology without any input from the parties, and then proceeds to apply that methodology retroactively to the present case, also without any input from the parties. In doing so, the majority effectively has taken over the litigation of the case from the parties themselves, an approach that this court rightly has characterized as exceeding the proper limits of its authority . . . because the result is not the product of a truly adversarial process." [Citation omitted.]), cert. denied        U.S.    , 132 S. Ct. 1095, 181 L. Ed. 2d 977 (2012). By denying the state's motion for argument and reconsideration, the majority merely reconfirms my belief that it has not engaged in an objective assessment of the constitutionality of the death penalty under our state constitution. Instead, the majority's conclusion that the death penalty is unconstitutional constitutes "a judicial invalidation, without constitutional basis, of the political will of the people." *State* v. *Santiago*, supra, 318 Conn. 278 (*Rogers, C. J.*, dissenting). Unfortunately, with this final act denying the state an opportunity to speak on issues that it has had no prior opportunity to address, this regrettable episode in this court's history concludes.

I would grant the state's motion for argument and

reconsideration. Accordingly, I dissent.

[1] See *State* v. *Santiago*, supra, 318 Conn. 236 (*Rogers, C. J.*, dissenting) (defendant made no claim that death penalty is unconstitutional on basis of historical development of death penalty in this state, rarity of its imposition in state, sentencing practices in other states, opinions and recommendations of professional associations, delays in executions, racial disparities in imposition of death penalty, possibility of erroneous death sentences or inherent conflict between constitutional requirement that discretion of jury to impose death penalty must be cabined and requirement that its discretion to accord mercy not be constrained); id., 236 n.3 (by addressing factors that defendant did not raise, majority effectively overruled this court's prior cases finding death penalty constitutional under state constitution); id., 239 (validity of this court's previous holdings that death penalty is constitutional under state constitution was not properly before court); id., 264 (defendant did not raise claim that death penalty is so rarely imposed that it is unconstitutional, parties did not have opportunity to brief issue, and trial court made no factual findings on issue); id., 264 n.30 (majority relied on "cherry picked extra-record sources that provide slanted and untested explanations for the history of the death penalty in this state"); id., 267 (majority relied on "slanted and untested sources that neither party has had the opportunity to review or to respond to" in making determination that sentencing trends and societal mores in other jurisdictions support conclusion that death penalty is unconstitutional in this state); id. (majority relied on opinions and recommendations of professional associations to support conclusion that death penalty is unconstitutional even though defendant had not raised issue and neither party had opportunity to review or respond to extra-record sources that majority relied on); id., 271 n.34 (majority concluded that delays in execution of defendants, racial disparities in imposition of death penalty and danger of erroneous executions had diminished penological value of death penalty despite fact that defendant had raised none of these claims); see also id., 394–95 (*Espinosa, J.*, dissenting) (majority improperly relied on extra-record sources regarding sentencing practices in other states); id., 396–97 (majority improperly relied on extra-record sources regarding sentencing practices in this state).

[2] As I stated in my dissenting opinion, I do not agree that Kane's remarks showed that he believed that, after a prospective repeal, the death penalty would constitute cruel and unusual punishment. *State* v. *Santiago*, supra, 318 Conn. 261–62 n.28.

[3] Specifically, the state made the following arguments, among others. First, it pointed out that the majority concluded that "from the earliest days of the colonies, and extending until the adoption of the state constitution in 1818, the people of Connecticut saw themselves as enjoying significant freedoms from cruel and unusual punishment, freedoms that were *safeguarded by our courts* and enshrined in our state's preconstitutional statutory and common law." (Emphasis added; footnote omitted.) *State* v. *Santiago*, supra, 318 Conn. 37–38. The state contended that, to the contrary, the scholarly literature shows that the preconstitutional law in this state was intended to prevent *courts* from imposing punishments that the *legislature* had not authorized. It further contends that the due process clauses of the state constitution were intended to codify this preconstitutional legal tradition, not to allow courts to invalidate statutorily authorized punishments. Therefore, the state argues, the evolving standards of decency rubric, which allows courts to invalidate statutorily authorized punishments, does not apply under the state constitution. Accordingly, the state contends that, to the extent that this court concluded otherwise in *State* v. *Ross*, 230 Conn. 183, 246, 646 A.2d 1318 (1994) ("our due process clauses impliedly prohibit [statutory] punishment that is cruel and unusual"), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), *Ross* should be overruled.

Second, the state pointed out that the majority concluded that "the death penalty has lost its retributive mooring in Connecticut [because] the lengthy if not interminable delays in carrying out capital sentences do not just undermine the death penalty's deterrent effect; they also spoil its capacity for satisfying retribution." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 318 Conn. 99–100. The state contended in its motion for argument and reconsideration that the majority failed to recognize that this reasoning "turns on its head the accepted proposition that a robust appellate procedure is vital to shield inmates from improper death sentences." In addition, the state claimed that it could present evidence explaining the delays in executing the death penalty in this state that would undermine the conclusion that the delays are unconstitutional.

Third, the state pointed out that the majority concluded that "punishment fails to satisfy the demands of retributive justice [because of] the ever present danger of irreversible error." *State* v. *Santiago*, supra, 318 Conn. 103. The state contended that the majority failed to recognize that: (1) none of the prisoners on death row seriously contends that he did not commit the crime for which he was sentenced to death; and (2) P.A. 12-5 has entirely eliminated the possibility of erroneous death sentences for future crimes.

Fourth, the state pointed out that the majority states that "it has become apparent that the dual federal constitutional requirements applicable to all capital sentencing schemes—namely, that the jury be provided with objective standards to guide its sentence, on the one hand, and that it be accorded unfettered discretion to impose a sentence of less than death, on the other—are fundamentally in conflict and inevitably open the door to impermissible racial and ethnic biases." Id., 14. The state contends that sentencers do not have unfettered discretion to consider mitigating evidence in this state.

Fifth, the state pointed out that the majority states that prosecutors have "virtually unfettered discretion whether actually to charge defendants with capital crimes . . . ." Id., 25. In addition, the majority states that, "[a]fter thoroughly reviewing the operation of Connecticut's capital sentencing scheme over the past four decades, we are persuaded that . . . the opportunity for the exercise of unfettered discretion at key decision points in the process has meant that the ultimate punishment has not been reserved for the worst of the worst offenders." Id., 114. The state contends that there is no evidence that prosecutors have ever abused their discretion to seek or not to seek the death penalty in a particular case and that this court previously has held that it would be inappropriate for this court to second-guess the exercise of prosecutorial discretion.

[4] Ironically, after this court's decision in *Santiago* was released, one of the strongest opponents of the death penalty in the legislature during the debates on P.A. 12-5, Senator Gary A. Winfield, who was Representative Gary A. Holder-Winfield at the time of the debates, stated publicly that P.A. 12-5 did not reflect a legislative or societal consensus that the death penalty is no longer an appropriate punishment for the most egregious murders in this state. Specifically, Senator Winfield stated: "I don't see [this court's decision in *Santiago*] as a victory for several reasons. One, the Supreme Court actually said something different than what we said. It didn't just agree with the legislature. The Supreme Court [decision] says, 'What they really wanted to do, despite what they said, is they really wanted to abolish it anyway, so let's go ahead and do that.'

"So the Supreme Court is not in agreement with what the legislature did. Let's not get this confused. You might not like what happened. You might not like where we wound up. But it's not because the Supreme Court said, 'OK, let's give the legislature what they actually said they wanted.' Because if they were doing that, they would have left it like it is. Or they would have gone back and said, 'Look, for these reasons, which are completely separate from any impetus from the legislature, the death penalty is abolished.' " P. Bass, "Death Penalty Courage Or Hypocrisy?" New Haven Independent, August 27, 2015, available at http://www.newhavenindependent.org/index.php/archives/entry/death_penalty_courage/ (last visited October 7, 2015).