**James Edward REID, Plaintiff,**

v.

**Gene M. JOHNSON, et al., Defendants.**

**No. CIV.A. 3:03CV1039.**

United States District Court,
E.D. Virginia.
Richmond Division.

Sept. 3, 2004.

Clifford Lee Harrison, James Clinton Turk, Jr., Stone Harrison & Turk, Radford, VA, Robert Edward Lee, Jr., Jennifer Leigh Givens, Charlottesville, VA, Marie Frances Donnelly, Evanston, IL, for Plaintiff.

Katherine Pharis Baldwin, Office of the Attorney General, Richmond, VA, for Defendants.

## MEMORANDUM OPINION

HUDSON, District Judge.

Plaintiff, James Edward Reid, a Virginia state inmate sentenced to death, brings

this civil rights action under 42 U.S.C. § 1983 (" § 1983"). Reid is scheduled to be executed on September 9, 2004. The matter is before the Court on Reid's amended motion for preliminary injunctive relief "in the form of a stay of his execution scheduled for September 9, 2004." Pl.'s Mem. In Supp. of Am. Mot. for Prelim. Inj. Relief at 35.

## I. Procedural History

On the morning of October 12, 1996, Reid went to the home of Annie Lester, an elderly woman. Reid stabbed Lester 22 times and inflicted multiple other injuries to Lester's head, face and arms. At some point during the murder, Reid removed some of Lester's clothes and ransacked her bedroom. Reid entered an *Alford*[1] plea and was convicted, *inter alia,* of the capital murder of Lester during the commission of attempted robbery and/or attempted rape. On February 20, 1998, the Circuit Court for Montgomery County sentenced Reid to death.

In Virginia, inmates sentenced to death are executed by electrocution or lethal injection.[2] Since 1995, Virginia has permitted the condemned inmate to elect his method of execution. Va.Code § 53.1–234. Fifteen days prior to the date of execution, the inmate must make his selection. *Id.* If the inmate fails to make a selection in a timely manner, he will be executed by lethal injection. *Id.*

After Reid's direct and collateral challenges to his conviction and sentence were exhausted, Virginia set an execution date

for Reid of December 18, 2003.[3] Reid chose to allow the statutory default provision to apply and he was scheduled to be executed by lethal injection. On December 15, 2003, three days prior to his scheduled execution, Reid filed a civil rights complaint under 42 U.S.C. § 1983 with this Court challenging the manner in which Virginia intended to carry out his execution.

This Court *sua sponte* dismissed the action as an unauthorized 28 U.S.C. § 2254 action (" § 2254"). The United States Court of Appeals for the Fourth Circuit granted a stay of execution. On August 2, 2004, following the decision of the Supreme Court in *Nelson v. Campbell,* —— U.S. ——, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004), the Fourth Circuit issued an opinion remanding the matter to this Court wherein it stated that:

> In light of *Nelson,* we conclude that Reid has stated a cognizable claim under § 1983. Like Nelson, Reid does not assert that lethal injection *generally* is an unconstitutional method of execution. Rather, he asserts only that the particular protocol the State plans to use is impermissible; he acknowledges that other protocols would pass constitutional muster. *See* Pl.Appellant's Reply to Def.'s Mot. to Vacate as Moot the Order of Dec. 17, 2003 at 10–11.

*Reid v. Johnson,* 105 Fed.Appx. 500, 503 (4th Cir.2004)(emphasis in original). The Fourth Circuit further directed that the stay of execution would remain in effect

---

**1.** *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

**2.** Electrocution is a constitutionally acceptable method of execution. *See In re Kemmler,* 136 U.S. 436, 447–48, 10 S.Ct. 930, 34 L.Ed. 519 (1890); *In Re Sapp,* 118 F.3d 460, 464 (6th Cir.1997).

**3.** *Reid v. Commonwealth,* 256 Va. 561, 506 S.E.2d 787 (1998) (direct appeal), *cert. denied,* 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999); *Reid v. Taylor,* No. Civ. A. 7:00cv859, 2002 WL 31107536 (W.D.Va. Sep.23, 2002)(federal habeas denied), *aff'd,* 349 F.3d 788 (4th Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 979, 157 L.Ed.2d 810 (2003).

for ten days following the issuance of its mandate. However, prior to the issuance of the mandate, the Supreme Court of the United States vacated the stay of execution issued by the Fourth Circuit. The Commonwealth set a new execution date for Reid of September 9, 2004.[4]

On Friday, August 20, 2004, the Fourth Circuit granted Reid's request for an expedited issuance of the mandate. That same day, Reid filed an amended complaint with this Court. In his amended complaint, Reid claimed his rights under the Eighth and Fourteenth Amendments would be violated because: (1) the defendants were going to administer chemicals to him that would cause unnecessary pain in the execution of his sentence of death; (2) the defendants were going to use a cut down procedure to gain venous access; and (3) the defendants failed to provide sufficient notice of how they intend to gain venous access. Thereafter, the parties conducted expedited discovery and Reid moved for a preliminary injunction. On September 3, 2004, the Court completed the evidentiary hearing on Reid's motion for a preliminary injunction.

## II. Facts Pertaining To Reid's Execution By Lethal Injection [5]

Virginia's execution protocol provides that, on the day of his execution, a physician or other qualified person shall assess the condemned and record his weight. The lethal substances will be injected into the inmate through an intravenous ("IV") line placed percutaneously into veins on sites of the body deemed appropriate. The individuals who will be responsible for gaining venous access and administering the lethal substances are required to have been trained in all aspects of intravenous line placement.[6] Virginia's execution protocol prohibits the use of a surgical cut down to gain venous access. Gene Johnson, the Director of Virginia Department of Corrections, during his testimony, assured the Court that such procedures will not be used for Reid.

Prior to the execution, electrodes, which serve as a heart monitor, will be attached to Reid. The heart monitor is watched by a physician who also is present during the administration of the lethal chemicals. Administration of the lethal substances entails the injection of three substances in a prescribed three step process. Step one involves the injection of 2 grams of sodium thiopental. Step two requires the injection of 50 milligrams of pancuronium bromide. Step three requires the injection of at least 120 milliequivalents of potassium chloride. Between each step, the IV line is flushed with a syringe. The flushing procedure ensures that each of the chemicals reaches the body in the dosage and order in which they are administered. The total duration of the execution, from the introduction of the first drug to death is five to ten minutes.

The first drug, sodium thiopental is a barbiturate sedative. Two grams of sodium thiopental is approximately five to eight times the dosage that would be used

---

4. In light of Reid's new execution date, Reid was provided with another opportunity to select the method of his execution. On August 25, 2004, Reid again elected to have the statutory default mechanism select his execution to be conducted by lethal injection.

5. The pertinent Virginia statute simply provides that execution by lethal injection shall be done by the "continuous intravenous injection of a substance or a combination of substances sufficient to cause death." Va.Code § 53.1–233.

6. The procedure of gaining venous access is commonly taught to people in advanced life support courses that many emergency medical technicians and paramedics complete. *See State v. Webb,* 252 Conn. 128, 750 A.2d 448, 452 (2000).

to render a 176 pound individual unconscious for general surgery.[7] Within moments after the injection of the sodium thiopental, the inmate will be rendered unconscious.[8] The condemned inmate will slip into unconsciousness in the same manner as that experienced by a general surgery patient. The probability of the inmate regaining consciousness within the ensuing ten minutes is 3/1000 of one percent. The probability of the inmate regaining consciousness by minute fifteen is 6/1000 of one percent. The probability of the inmate regaining consciousness within twenty minutes never rises above 1/100 of one percent. In light of the inordinately high dosage, the weight or other physical attributes peculiar to a particular inmate will have a negligible impact on these probabilities. Flushing of the IV line prevents the sodium thiopental and the second and third drugs from interacting outside of the body of the inmate.[9]

The second chemical administered, pancuronium bromide, is a skeletal muscle relaxant that causes paralysis. Pancuronium suppresses involuntary seizures or motor manifestations that may occur during the execution process. These motor manifestations could give witnesses the false perception that the condemned inmate was experiencing pain. In light of the large dose of sodium thiopental, the inmate does not experience any pain associated with any potential involuntary motor reactions. Fifty milligrams of pancuronium bromide is a lethal dosage and will cause death by the cessation of respiration within two minutes. In this protocol, the probability that the inmate would be conscious of the physical effects of pancuronium is less than 1/100 of one percent.[10]

The third injection, at least 120 milliequivalents of potassium chloride, causes the condemned inmate's heart to stop. One hundred milliequivalents of potassium chloride is a lethal dose. Within moments after the potassium chloride has been injected, the heart of the inmate will stop beating. Shortly thereafter, brain activity will cease. Within three minutes after the injection of the potassium chloride, the inmate will be brain dead. A physician monitors the inmate's heartbeat and pronounces death.

Reid suggested that sodium pentobarbital is a more humane sedative to use in conducting lethal injections because it lasts longer. The Court is unpersuaded by this argument since the dose of sodium thio-

---

7. The following description of the effects of sodium thiopental are taken from the testimony of Dr. Mark Dershwitz, a board certified anesthesiologist, associated with the University of Massachusetts. Dr. Dershwitz also has a doctorate in pharmacology. He has performed extensive research in the area of the pharmacokinetics and pharmacodynamics of intravenous anesthetic agents, such as the medications used in the Virginia lethal injection protocol. Pharmacokinetics is the study of the time course of medications in the body, whereas Pharmacodynamics is the study of the effect of medications on the body. Dr. Dershwitz's clinical and academic experience with the administration of sodium thiopental and pancorium made him a convincing witness. The plaintiff's expert, Dr. Heath, conceded that with respect to the pharmacokinetics and pharmacodynamics of sodium thiopental, he defers to Dr. Dershwitz's expertise.

8. The term "consciousness", as used in this opinion, refers to the ability to perceive or feel pain.

9. The chemical properties of sodium thiopental and the extreme dose administered dispel the suggestion that contact between pancuronium and sodium thiopental in the IV line would significantly hinder the effectiveness of the sodium thiopental.

10. The probability that an average surgery patient may regain consciousness is .2 percent.

pental administered by Virginia assures the inmate's unconsciousness. Moreover, because of its infrequent use, pentobarbital lacks the state of the art analysis regarding its effects and dependability that is available for sodium thiopental. It is not this Court's function to suggest more humane or medically acceptable execution protocol, but to determine whether the method adopted by the Commonwealth of Virginia is constitutionally sound.

Reid presented the post-mortem blood toxicology reports of condemned inmates from other states. Through his expert, Dr. Mark Heath, Reid asserted that the toxicology reports demonstrated that inadequate amounts of sodium thiopental had reached the inmate's body and thus, there was a possibility that the inmate may have been conscious during his execution. The lack of pertinent information regarding when and how the blood was gathered renders these reports of little value as a basis for rendering an opinion based on reasonable medical certainty as to the amount of sodium thiopental that had actually reached the inmate's system. Any probative value of the toxicology reports was further diminished by the lack of information regarding the specific chemicals used to execute the inmate described in the report and the unexplained presence of other sedatives. In short, the sodium thiopental level found in the toxicology report for a particular inmate is not indicative of the consciousness of that inmate during his execution, much less probative of whether a condemned Virginia inmate will be conscious throughout his execution.

### III. Scope of Review

Having been dismissed as a successive and unauthorized § 2254 action, this case was remanded to this Court from the Fourth Circuit in light of the Supreme Court's decision in *Nelson v. Campbell*, —— U.S. ——, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004). In *Nelson*, a condemned inmate claimed Alabama's possible use of a "cut down" procedure to carry out his lethal injection would violate the Eighth Amendment's prohibition against cruel and unusual punishment.[11] *Id.* The Supreme Court concluded that the inmate's claim was cognizable under § 1983 because it did not involve a challenge to a state's execution protocol but instead to a specific arguably unnecessary precursor medical procedure. *Id.* at 2123. The Court declined, however, to reach the "difficult issue" of whether to categorize method-of-execution claims as civil rights actions under § 1983 or habeas corpus actions under § 2254. *Id.*

This case aptly demonstrates the difficulties faced by district courts in narrowing the scope of the issues when method of execution claims are brought under § 1983. On appeal, the issue before the Fourth Circuit was Reid's claim that the "combination of the three drugs—sodium thiopental or sodium pentothal, pancuronium bromide or Pavulon, and potassium chloride...would cause him to consciously suffer an excruciatingly painful and protracted death." *Reid v. Johnson*, 105 Fed. Appx. 500, 502 (4th Cir.2004). Consequently, for purposes of a hearing seeking preliminary injunctive relief based on a claim under § 1983, this Court limited the scope of discovery and the introduction of evidence to only those issues pertaining to the particular chemical combination to be used in this case and their probable affect on Reid.

---

11. The Commonwealth of Virginia, through its agents, the Assistant Attorney's General and the Director of Corrections have re-peatedly declared that there will be no "cut down" performed on Petitioner. Thus, this issue is not before this Court.

Throughout the proceedings, Reid's counsel attempted to adduce evidence regarding personnel, training, security, timing, equipment, and the potentiality for human error in the administration of the lethal injection. While this Court acknowledges that it is difficult to analyze the particular chemical mixture without reference to the other elements of the protocol mentioned above, permitting the inclusion of those factors would be tantamount to a challenge to lethal injection generally and place the case outside the boundaries of § 1983 and into the compass of § 2254. Consequently, the issue before this Court for purposes of a preliminary injunction, in the form of a stay of execution, is a narrow one—does the particular chemical recipe used by the Commonwealth of Virginia in the execution of Reid amount to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the Constitution.

## IV. Preliminary Injunctive Relief

■■■ The Fourth Circuit uses a "balance of hardships" test to determine whether a preliminary injunction should issue. The analytical framework includes:

(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;

(2) the likelihood of harm to the defendant if the requested relief is granted;

(3) the likelihood that the plaintiff will succeed on the merits; and

(4) the public interest.

*Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991) (citing *L.J. By and Through Darr v. Massinga,* 838 F.2d 118, 120 (4th Cir.1988)). *See Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 193–96 (4th Cir.1977). The burden lies with the plaintiff to establish that each of the four factors warrants the exercise of the extraordinary power of injunction. *See Direx Israel Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 812 (4th Cir.1991).

First, the plaintiff must make a "clear showing of irreparable harm" that is " 'neither remote nor speculative, but actual and imminent'." *Id.* (quoting *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989)). The second step is to consider the likelihood of harm to the defendant from the grant of injunctive relief and then to balance the likelihood of irreparable harm to the plaintiff from failing to grant such relief against the likelihood of harm to the defendant if it is granted. *Id.* The result of this balancing determines the degree to which the plaintiff must show a likelihood of success on the merits to obtain a preliminary injunction in the third step of the process. Under this third step, the Fourth Circuit has explained that if after balancing the irreparable harm to the plaintiff against the harm to the defendant,

the balance tips decidedly in favor of the plaintiff, a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation. As the balance tips away from the plaintiff, a stronger showing on the merits is required.

*Id.* at 812–13 (internal quotations and citations omitted). In other words, "the importance of probability of success increases as the probability of irreparable injury diminishes." *Blackwelder,* 550 F.2d 189, 195 (4th Cir.1977). Fourth, the Court must consider whether the public interest favors the granting of preliminary injunctive relief. The balancing of hardships "must be analyzed conceptually before and separately from the likelihood of success on the merits." *Ciena Corp. v. Jarrard,* 203 F.3d 312, 323 (4th Cir.2000). Once "a court has

performed these separate analyses, it must then make the equitable determination whether to grant injunctive relief." *Id.*

## A. Likelihood Of Irreparable Harm To Reid

■ There must be a likelihood that immediate irreparable harm will occur. *See Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997). "The rule barring consideration of remote or speculative injury for purposes of a preliminary injunction applies despite the degree of injurious consequences." *Hodges v. Abraham* 253 F.Supp.2d 846, 864 (D.S.C.2002)(citing cases). The Fourth Circuit explained why the likelihood of the predicted harm is the primary consideration in the preliminary injunction analysis as follows:

> The very function served by requiring a clear showing of irreparable harm that must be actual and imminent rather than remote and speculative is to limit the deployment of the heavy artillery of preliminary injunctive relief to situations in which it is readily apparent to the court that such relief is actually necessary to prevent a harm from occurring.

*In Re Microsoft Corp. Litigation*, 333 F.3d 517, 530 (4th Cir.2003). Furthermore, the plaintiff must demonstrate a link between his underlying challenge and the predicted irreparable injuries. *See Manning v. Hunt*, 119 F.3d 254, 265 (4th Cir.1997).

■ Reid asserts that absent a preliminary injunction he will likely suffer an irreparable injury because: (1) he will be executed; (2) the defendants will use an unnecessary and extremely painful "cut-down" procedure or other method to gain venous access; and (3) Virginia will carry out his execution through the use of a combination of chemicals that will cause him to suffer severe and unnecessary pain in the moments before his death. However, in the context of this civil rights action, the harm to Reid does not include the fact of Reid's inevitable death. *See Nelson v. Campbell*, —— U.S. ——, 124 S.Ct. 2117, 2123, 158 L.Ed.2d 924 (2004). The "harm" of Reid's death flows from Reid's crimes and the sentence imposed by the state rather than from the method the state has chosen to execute the sentence. *See id.; Manning*, 119 F.3d at 265. Attempts to address that harm must be pursued by a petition for a writ of habeas corpus. *See Harvey v. Horan*, 278 F.3d 370, 374–80 (4th Cir.2002) (treating § 1983 action requesting access to DNA evidence as a successive application for habeas relief) *rehearing and rehearing en banc denied by*, 285 F.3d 298 (4th Cir.2002). Similarly excludable from the calculus of likely harm is pain and suffering that is attributable not to the drugs to be administered but rather to the remote possibility of human error and negligence inherent in any human endeavor. *See Campbell v. Wood*, 18 F.3d 662, 668 (9th Cir.1994).[12]

■ The state will not use a cut down procedure in this case. The possibility that there may be some minor difficulty

---

**12.** The Supreme Court has not endorsed the proposition that a civil rights action is the appropriate vehicle for litigating and eliminating any potential risk of human error associated with a general method of execution on the eve of that execution. *Nelson*, 124 S.Ct. at 2122–23; *Lonchar v. Thomas*, 517 U.S. 314, 329, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996); *Gomez v. U.S. Dist. Ct. for the N. Dist. Cal.*, 503 U.S. 653, 653–54, 112 S.Ct. 1652, 118 L.Ed.2d 293 (1992); *Fugate v. Department of Corrections*, 301 F.3d 1287, 1288 (11th Cir.), *cert. denied*, 536 U.S. 980, 123 S.Ct. 15, 153 L.Ed.2d 878 (2002). A claim seeking to enjoin a scheduled execution based on such risks is in substance "a challenge seeking to interfere with the sentence itself, and thus, is properly construed as a petition for habeas corpus." *In re Sapp*, 118 F.3d 460, 462 (6th Cir.1997); *see Nelson*, 124 S.Ct. at 2125.

locating a vein does not subject Reid to the offensive punishments the Eighth Amendment prohibits. *See State v. Webb,* 252 Conn. 128, 750 A.2d 448, 456 (2000) (citing *Hill v. Lockhart,* 791 F.Supp. 1388, 1394 (E.D.Ark.1992)); *see also Snipes v. DeTella,* 95 F.3d 586, 591 (7th Cir.1996) (rejecting the notion that the Eighth Amendment guarantees the right to be free of pain during any medical procedure). Accordingly, Reid's first and second assertions of likely irreparable harm are rejected. What remains is Reid's assertion that the state's mechanism for carrying out the sentence of death by lethal injection will be unconstitutionally painful.

In this context, it is accepted that any harm suffered by Reid will be irreparable in the sense that it cannot be undone after the fact of his execution. The more difficult question is what level of pain is prohibited. *See In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). "Punishments are cruel when they involve torture or a lingering death .... [cruel] implies there is something inhuman or barbarous, something more than the mere extinguishment of human life." *Id.* For the present motion, the Court concludes that Reid's harm must at least satisfy the Eighth Amendment's objective component for inmates challenging their conditions of confinement or medical care. *See Nelson v. Campbell,* —— U.S. ——, 124 S.Ct. 2117, 2123, 158 L.Ed.2d 924 (2004) (citing *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Thus, only that unnecessary pain that Reid is likely to experience which is "serious" or "significant" will be weighed. *Strickler v. Waters,* 989 F.2d 1375, 1381 (4th Cir.1993).

■ Reid contends that under Virginia's execution protocol there is a grave risk that he will retain or regain consciousness after the injection of the sodium thiopental and therefore experience all the pain associated with the pancuronium and the po-

tassium chloride. Reid contends the risk of this harm is exacerbated because the pancuronium and other factors will prevent the pertinent officials from recognizing that the sedative has failed to function properly. Reid has failed to make a clear showing of irreparable harm. *See Manning,* 119 F.3d at 265. The record before the Court establishes that under the protocol followed by Virginia the chance that Reid will be conscious of any pain associated with the second two drugs and of his death is less than 6/1000 of one percent.

Reid counters that it is possible that the intravenous surgical tubing may leak or that the chemicals may be mixed or injected incorrectly, the correctional officials may siphon off the sodium thiopental for the own use, et cetera. There is simply no reason to believe the speculative list of horribles described by Reid are likely to come to pass. The record establishes that the defendants have taken reasonable measures to eliminate the possibility of human error and to ensure the condemned will experience nothing other than insertion of an intravenous catheter followed by unconsciousness and death. In sum, the likelihood of Reid suffering irreparable harm from the manner in which the defendants intend to carry out his sentence is so remote as to be nonexistent. Reid's failure to show any likelihood of irreparable harm precludes him from obtaining preliminary injunctive relief. Accordingly, the Court denies Reid's request for a preliminary injunction. Nevertheless, in light of the limited time before Reid's execution, the Court will address the remaining factors of the preliminary injunction analysis for the benefit of any further appellate review.

**B. Likely Harm To Reid Balanced Against The Likely Harm To The State Defendants**

■ It is well settled that the state has "a significant interest in meting out a sen-

tence of death in a timely fashion." *Nelson v. Campbell,* —— U.S. ——, 124 S.Ct. 2117, 2123, 158 L.Ed.2d 924 (2004)(citing *Calderon v. Thompson,* 523 U.S. 538, 556–57, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998)); *In re Blodgett,* 502 U.S. 236, 238, 112 S.Ct. 674, 116 L.Ed.2d 669 (1992) (per curiam); *McCleskey v. Zant,* 499 U.S. 467, 491, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) ("[T]he power of a State to pass laws means little if the State cannot enforce them"). The state's interest in finality and in meting out a sentence of death in a timely manner acquires "an added moral dimension" when the lengthy state and federal proceedings reviewing the conviction and sentence have run their course. *See Calderon,* 523 U.S. at 556–57, 118 S.Ct. 1489. At this point, the state and the victims of crime can expect the moral judgment of the state to be carried out without delay. *Id.* at 556, 118 S.Ct. 1489. (citing *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). "To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." *Id.* (internal citations and quotations omitted).

Even if one were to assume that Reid had demonstrated a sufficient likelihood of harm to satisfy the first factor, that harm would be a thin shadow compared to the certain, profound and irreparable harm to the state if an injunction is issued. Under such circumstances, Reid must show a strong and significant likelihood success of the merits. *See In re Sapp,* 118 F.3d 460, 465 (6th Cir.1997). Reid's likelihood of success on the merits is negligible. As discussed below, Reid is highly unlikely overcome the series of procedural bars to his relief on the merits or to succeed in establishing his substantive Eighth Amendment claim.

## C. Likelihood Of Success On The Merits

Three significant procedural barriers stand between Reid and success on the merits. First, Reid's action is subject to dismissal because he has failed to exhaust his available administrative remedies for this action as required by 42 U.S.C. § 1997e(a). *See Nelson v. Campbell,* —— U.S. ——, 124 S.Ct. 2117, 2126, 158 L.Ed.2d 924 (2004). Second, Reid has waived any objection to the general method of his execution by lethal injection because he has twice by default selected that method over the constitutional alternative of electrocution. *See Stewart v. LaGrand,* 526 U.S. 115, 119, 119 S.Ct. 1018, 143 L.Ed.2d 196 (1999); *Orbe v. Johnson,* 267 Va. 568, 601 S.E.2d 543 (Va.2004). Third, Reid's consistent broad requests to enjoin his execution, rather than merely to enjoin a particular extraneous procedure, may ultimately warrant a finding that this action is, in effect, an unauthorized, successive petition for a writ of habeas corpus. *See Nelson,* 124 S.Ct. at 2125; *Lonchar v. Thomas,* 517 U.S. 314, 329, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996). The Court concludes it is highly unlikely that Reid would be able to overcome these procedural barriers and obtain relief.

Reid's ultimate success on his underlying constitutional claim is remote. While thirty-seven states and the federal government authorize lethal injection as a means of execution, Reid cannot identify any instance where a state's method of lethal injection has been found to be unconstitutional. *See Cooper v. Rimmer,* 379 F.3d 1029, 1030 (9th Cir.2004)(denying stay)(amended date Aug. 12, 2004). Indeed, lethal injection protocols using the same drugs challenged here repeatedly have been found constitutional. *See e.g. State v. Webb,* 252 Conn. 128, 750 A.2d 448

(2000); *Sims v. State,* 754 So.2d 657 (Fla. 2000).

Furthermore, in order to ultimately demonstrate a violation of his rights under the Eighth Amendment, Reid must show that there is a substantial risk that he will subjected to an "unnecessary and wanton infliction of pain," *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), "contrary to contemporary standards of decency." *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). *See LaGrand v. Lewis,* 883 F.Supp. 469, 470 (D.Ariz.1995). "Traditional deaths by execution, such as by hanging, have always involved the possibility of pain and terror for the convicted person." *Gray v. Lucas,* 710 F.2d 1048, 1061 (5th Cir.1983) (rejecting claim that death by cyanide gas which could last seven minutes and be extremely painful, violated the Eighth Amendment); *see also Campbell v. Wood,* 18 F.3d 662, 683–87 (9th Cir.1994) (holding that death by hanging is not cruel and unusual even if it involved some pain). The record before the Court reflects that under Virginia's protocol, there is no foreseeable probability that Reid's execution will involve "torture or a lingering death." *In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890).

Reid's claim that his rights will be violated focuses on what may go wrong. However, as previously noted "[t]he risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review." *See Campbell,* 18 F.3d 662, 687 (9th Cir.1994); *see also, McKenzie v. Day* 57 F.3d 1461, 1469 (9th Cir.1995) ("[W]e are aware of no authority for the proposition that a prisoner is entitled, for example, to have a lethal injection administered by a physician). Accordingly, the Court finds there is little to no likelihood that Reid could demonstrate a violation of his rights under the Eighth Amendment.

### D. Public Interest and Equitable Principles

This is not an instance where there are questions as to innocence or sufficiency of due process of an individual set to be executed. *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Reid's claim to receive a sentence of death without any unnecessary pain pales in comparison to the interest the general public has in the orderly administration of justice. *Calderon v. Thompson,* 523 U.S. 538, 556–57, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). Thus, the Fourth Circuit has admonished that, "[l]ast minute stays [of execution] ... represent an interference with the orderly processes of justice which should be avoided in all but the most extraordinary of circumstances." *Stockton v. Angelone,* 70 F.3d 12, 13 (4th Cir.1995). The public interest in denying a stay rests firmly on the side of the defendants.

Additionally, the Court must consider the timing and nature of Reid's request under general equitable principles. *Nelson v. Campbell,* —— U.S. ——, 124 S.Ct. 2117, 2126, 158 L.Ed.2d 924 (2004). In this respect, the Supreme Court instructed that the courts should not countenance manipulation of the judicial process and emphasized that, "there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Id.*

Reid was sentenced to death in February of 1998, yet he waited until December 15, 2003, three days before his scheduled execution on December 18, 2003, to bring a challenge to Virginia's method for carrying out his sentence. Ever since he was sentenced to death, Reid was aware that Vir-

ginia would carry out that sentence either by electrocution or lethal injection. Reid's suggestion that he could not have not challenged the method of his execution prior to December of 2003 is grounded in neither law nor fact. Virginia not only allowed for, but in fact required Reid to bring a challenge to the possible methods of execution soon after he was indicted on capital charges. *See Orbe v. Johnson,* 267 Va. 560, 562, 601 S.E.2d 547, 2004 WL 743795 at *3 (2004). Additionally, after Reid was sentenced to death, the federal courts provided an additional forum in which Reid might have challenged the methodology of his execution. *See Nelson,* 124 S.Ct. at 2122; *Harris v. Johnson,* 376 F.3d 414, 418–19 (5th Cir.2004). Reid had over four years in which he could have challenged the details of his execution without unduly upsetting the state's schedule for carrying it out. By waiting as long as he did, Reid "leaves little doubt that the real purpose behind his claim is to seek a delay of his execution, not merely to effect an alteration in the manner in which it is carried out." *Harris v. Johnson,* 376 F.3d 414, 418 (5th Cir.2004). Reid's delay in this matter is of significant magnitude in and of itself to foreclose any claim to equity. *See Gomez v. U.S. Dist. Ct. for the Northern Dist. of Cal.,* 503 U.S. 653, 653–54, 112 S.Ct. 1652, 118 L.Ed.2d 293 (1992).

## V. Conclusion

The grant of interim injunctive relief is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 811 (4th Cir.1991) (internal quotation omitted). Each of the factors the Court must consider in granting such relief weigh decidedly and firmly against Reid: the potential for Reid to experience any harm is negligible, the

harm to the state if an injunction is issued is severe, Reid is highly unlikely to succeed on his underlying claim, and his inexcusable delay precludes his access to equity. Reid's motion for a preliminary injunction will be denied.

It is so Ordered.