**Ex parte Derrick Sean O'BRIEN.**

**No. WR–51264–03.**

Court of Criminal Appeals of Texas.

May 17, 2006.

Catherine Greene Burnett, Houston, for Appellant.

Roe Wilson, Asst. District Atty., Houston, Matthew Paul, State's Atty., Austin, for State.

## *ORDER*

PER CURIAM.

This is a subsequent application for habeas corpus in which applicant advances an Eighth Amendment claim, asserting that he might suffer pain during the administration of the chemicals during lethal injection.

Applicant was convicted of capital murder on April 9, 1994. We affirmed the conviction and sentence. *O'Brien v. State*, no. 71,859 (Tex.Crim.App. May 15, 1996). On December 16, 1997, applicant filed his initial application for writ of habeas corpus pursuant to Article 11.071. On August 23, 2001, applicant filed a supplemental application for writ of habeas corpus. We denied relief on his initial application and dismissed, as an abuse of the writ, his untimely subsequent application. *Ex parte O'Brien*, No. WR–51,264–01, WR–51,264–02 (Tex.Crim.App. February 6, 2002). On May 15, 2006, we issued a stay of the execution to review applicant's second subsequent application for writ of habeas corpus.

We have now reviewed this subsequent application and find that it should be dismissed. Our order of May 15th, 2006, staying the proceedings in this case is lifted.

COCHRAN, J., filed a concurring statement in which KELLER, P.J., and KEASLER and HERVEY, JJ., joined.

PRICE, J. filed a dissenting statement in which HOLCOMB, J., joined.

JOHNSON, J., filed a dissenting statement.

WOMACK, J., dissents.

COCHRAN, J., filed a concurring statement in which KELLER, P.J., and KEASLER, and HERVEY, JJ., joined.

I respectfully concur in the court's action lifting applicant's temporary stay of execution. Because of the last-minute nature of applicant's habeas corpus filing, a majority of this Court voted to grant a stay to have sufficient time to assess both the procedural aspects of the subsequent writ application and the merits of the claim.

Applicant, who was convicted of capital murder in 1994, does not, in this subsequent application, challenge Texas' right to execute him. Indeed, he claims that he does not challenge the method of his execution—lethal injection. His sole challenge is to the specific chemicals that the Texas Department of Criminal Justice (TDCJ) uses in its lethal injection protocol. He contends that two of these three chemicals, pancuronium bromide and potassium chloride, are "unnecessary to carrying out his execution" and "unnecessarily create a risk that O'Brien will suffer excruciating excessive pain during the administration of his lethal injection."

Applicant argues that the United States Supreme Court has recently stayed the execution of a Florida death row inmate and granted certiorari to address claims similar to those raised in his successor application. *See Hill v. Crosby*, — U.S. —, 126 S.Ct. 1189, 163 L.Ed.2d 1144 (2006). The questions on which the Supreme Court granted certiorari in *Hill v. Crosby* are:

1. Whether a complaint brought under 42 U.S.C. § 1983 by a death-sentenced state prisoner, who seeks to stay his execution in order to pursue a challenge to the chemicals utilized for carrying out the execution, is properly recharacterized as a habeas corpus petition under 28 U.S.C. § 2254.

2. Whether, under this Court's decision in *Nelson*, a challenge to a particular protocol the State plans to use during the execution process constitutes a cognizable claim under 42 U.S.C. § 1983.

These questions do not address the merits of whether the chemicals used in the Florida or Texas lethal injection protocol are "unnecessary," "cause excruciating pain," or violate the Eighth Amendment to the United States Constitution. The case addresses only a procedural issue under the federal Civil Rights Act, thus, there is no reason to stay applicant's execution pending the Supreme Court's resolution in *Hill*. Furthermore, applicant has not met the Supreme Court standard for granting a stay of execution.

**A. The Supreme Court Standard for Granting a Stay to Litigate Eighth Amendment Lethal Injection Claims.**

Two years ago, in *Nelson v. Campbell*, the Supreme Court set out the standard for granting a stay of execution to bring an equitable action challenging the methodology (or chemical protocol) of an inmate's execution:

before granting a stay [of execution], a district court must consider not only the

likelihood of success on the merits and the relative harms the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim. Given the State's significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.[1]

Thus, even if the Supreme Court, in the pending *Hill* case, allows an inmate to bring an equitable action challenging the lethal injection chemical protocol, an inmate still would not be entitled to either a stay or equitable relief unless, under *Nelson,* he has shown a fair likelihood (such as a prima facie showing) of success on the merits of his claim, and that he has not delayed unnecessarily in bringing it.[2]

In assessing the validity of a claim of "cruel and unusual" punishment, the Supreme Court has considered various factors, such as whether a method of punishment (1) deviates from contemporary norms and standards of society; (2) offends the dignity of the prisoner and society; or (3) inflicts unnecessary physical or psychological pain "contrary to contemporary standards of decency."[3] These factors dictate that punishments may not include torture, slow death, or "unnecessary and wanton infliction of pain."[4] Thus, to be entitled to stay, an inmate must make a prima facie showing that the injection protocol causes torture, a lingering death, or wanton infliction of pain contrary to contemporary standards of decency.

As the Supreme Court has repeatedly noted in the Eighth Amendment context of the evolving standards of decency, "[t]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures."[5] Of the thirty-eight states that presently permit capital punishment, approximately thirty-seven of them have adopted lethal injection as the primary means of execution.[6] Almost every single

**1.** *Nelson v. Campbell,* 541 U.S. 637, 649–50, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004) (citations omitted).

**2.** Applicant appropriately notes that this Court recently held that a direct appeal challenge to the lethal injection chemicals used in Texas was not ripe because the defendant's execution was not "imminent." *See Doyle v. State,* No. 74,960, 2006 WL 1235088, at *4, 2006 Tex.Crim.App. LEXIS 925, *10–11 (Tex. Crim.App., May 10, 2006) (not designated for publication). Such a claim certainly is ripe for review once an execution date is set. Applicant's execution date was set on February 3, 2006. He filed his subsequent writ on May 10, 2006, five days before his scheduled execution.

**3.** *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *see also Wilson v. Seiter,* 501 U.S. 294, 297–98, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

**4.** *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("It suffices to note that the primary concern of the drafters was to proscribe 'torture[s]' and other 'barbar[ous]' methods of punishment"); *In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890) ("Punishments are cruel when they involve torture or a lingering death ..."). But traditional modes of execution, "such as hanging, have always involved the possibility of pain and terror for the convicted person." *Gray v. Lucas,* 710 F.2d 1048, 1061 (5th Cir.1983) (rejecting claim that execution by cyanide gas—which could last seven minutes and be extremely painful—violated Eighth Amendment).

**5.** *Penry v. Lynaugh,* 492 U.S. 302, 331, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Atkins v. Virginia,* 536 U.S. 304, 312, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *Roper v. Simmons,* 543 U.S. 551, 589, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (O'Connor, J., dissenting).

**6.** *Cooper v. Rimmer,* 358 F.3d 655, 659 (9th Cir.2004); *State v. Webb,* 252 Conn. 128, 750 A.2d 448, 457, n. 10 (2000) (summarizing legislation in 34 states).

one of those states uses the same three chemicals as TDCJ.[7] Moreover, I am unable to find any court that has held that lethal injection in general, or a specific lethal-injection protocol in particular, violates the Eighth Amendment.[8]

## B. Applicant has not made a prima facie showing that his constitutional claim is meritorious.

Applicant's claim, simply put, is that the lethal injection chemicals used by TDCJ could cause a painful death. Applicant offers neither evidence—much less scientific or medical data, peer-reviewed journal articles, expert affidavits, or controlled scientific studies—nor law to support this scientifically based medical claim. But numerous courts across this nation have rejected claims similar to applicant's—some after extensive evidentiary hearings,[9] others based upon the face of the pleading.[10]

According to the TDCJ response to applicant's administrative complaint, the lethal injection method used by TDCJ is based upon three separate chemicals.

First, an inmate is given a "massive dose of sodium pentothal," a barbiturate also known as sodium thiopental.[11] This drug is most commonly used as a fast-acting medical anesthesia. It is given in small doses during operations, and, because it rapidly reaches the brain, it generally causes unconsciousness within 30–45 seconds. When used as a part of the lethal injection process, however, it is injected at approximately nine to ten times the medical-anesthesia level.[12] TDCJ uses 3 grams

---

7. See Cooper v. Rimmer, 358 F.3d at 659.

8. See Webb, 750 A.2d at 457–58 (collecting cases). The following cases deny Eighth Amendment challenges to the lethal-injection protocol on the merits: Cooper, 358 F.3d at 659; Wheeler v. Commonwealth, 121 S.W.3d 173, 186 (Ky.2003); Bieghler v. State, 839 N.E.2d 691, 694–96 (Ind.2005); Abdur'Rahman v. Bredesen, 181 S.W.3d 292, 309 (Tenn. 2005); Reid v. Johnson, 333 F.Supp.2d 543, 553 (E.D.Va.2004); People v. Snow, 30 Cal.4th 43, 132 Cal.Rptr.2d 271, 65 P.3d 749, 800–01 (2003); Sims v. State, 754 So.2d 657, 668 (Fla.2000); State v. Webb, 252 Conn. 128, 750 A.2d 448, 457 (2000); LaGrand v. Stewart, 133 F.3d 1253, 1265 (9th Cir.1998) (lethal injection in Arizona). The following cases dismissed Eighth Amendment challenges to the lethal-injection protocol without reaching the merits: Boyd v. Beck, 404 F.Supp.2d 879, 883–84 (E.D.N.C.2005); Aldrich v. Johnson, 388 F.3d 159, 161 (5th Cir.2004) (lethal injection in Texas); Harris v. Johnson, 376 F.3d 414, 419 (5th Cir.2004) (lethal injection in Texas). In the following cases, the issue remains ripe: Rutherford v. Crosby, 546 U.S. ——, 126 S.Ct. 191, 163 L.Ed.2d 1144 (Jan. 31, 2006) (granting stay of execution pending disposition of cert. pet.); Anderson v. Evans, No. CIV–05–0825–F, 2006 WL 83093, at *2, 2006 U.S. Dist. LEXIS 1632, at *1–2, (W.D.Okla. Jan.11, 2006) (denying motion to dismiss 42 U.S.C. § 1983 Eighth Amendment challenge to lethal-injection protocol).

9. See, e.g., Abdur'Rahman v. Bredesen, 181 S.W.3d 292 (Tenn.2005); Reid v. Johnson, 333 F. Supp 2d 543 (E.D.Va.2004); Sims v. State, 754 So.2d 657 (Fla.2000); State v. Webb, 252 Conn. 128, 750 A.2d 448 (Conn. 2000); State v. Deputy, 644 A.2d 411 (Del.Super.1994).

10. See, e.g., Bieghler v. State, 839 N.E.2d 691 (Ind.2005); Boyd v. Beck, 404 F.Supp.2d 879 (E.D.N.C.2005); LaGrand v. Stewart, 133 F.3d 1253 (9th Cir.1998); Woolls v. McCotter, 798 F.2d 695 (5th Cir.1986); Hill v. Lockhart, 791 F.Supp. 1388 (E.D.Ark.1992); Cooper v. Rimmer, 358 F.3d 655, 659 (9th Cir.2004).

11. Appendix C to Derrick O'Brien's application for writ of habeas corpus (Texas Department of Criminal Justice Inter–Office Communication to Derrick O'Brien, dated March 27, 2006).

12. See Beardslee v. Woodford, 395 F.3d 1064, 1075 (9th Cir.2005) (noting that "[a]ccording to the State's expert, over 99.999999999999% of the population would be unconscious within sixty seconds from the start of the administration of five grams of sodium pentothal—which is 12.5 times the normal surgical dos-

of sodium pentothal in 30 milliliters of solution. TDCJ states that "[t]his dose is considered to be lethal in adults."[13]

Second, the inmate is given an injection of pancuronium bromide which is a neuromuscular blocking agent, similar to curare.[14] Pancuronium bromide causes the inmate to suffocate, because the lungs stop moving. At the same time, the drug's paralytic effect prevents the person from manifesting any sensation by facial expression, hand movement, or speech.[15] As explained by one court:

> Pancuronium suppresses involuntary seizures or motor manifestations that may occur during the execution process. These motor manifestations could give witnesses the false perception that the

condemned inmate was experiencing pain. In light of the large dose of sodium thiopental, the inmate does not experience any pain associated with any potential involuntary motor reactions. Fifty milligrams of pancuronium bromide is a lethal dosage and will cause death by the cessation of respiration within two minutes. In this protocol, the probability that the inmate would be conscious of the physical effects of pancuronium is less than 1/100 of one percent.[16]

Third, the inmate is given an injection of potassium chloride. Potassium chloride burns intensely as it goes through the veins toward the heart. When potassium chloride reaches the heart, it causes a heart attack.[17]

---

age—and would render most people unconscious for a period in excess of 13 hours"); *Reid v. Johnson,* 333 F.Supp.2d at 546–47. In *Reid,* the court explained:

> The first drug, sodium thiopental [also known as sodium pentothal] is a barbiturate sedative. Two grams of sodium thiopental is approximately five to eight times the dosage that would be used to render a 176 pound individual unconscious for general surgery. Within moments after the injection of the sodium thiopental, the inmate will be rendered unconscious. The condemned inmate will slip into unconsciousness in the same manner as that experienced by a general surgery patient. The probability of the inmate regaining consciousness within the ensuing ten minutes is 3/1000 of one percent. The probability of the inmate regaining consciousness by minute fifteen is 6/1000 of one percent. The probability of the inmate regaining consciousness within twenty minutes never rises above 1/100 of one percent. In light of the inordinately high dosage, the weight or other physical attributes peculiar to a particular inmate will have a negligible impact on these probabilities.
>
> *Id.*

**13.** Appendix C. *See Beardslee v. Woodford,* 395 F.3d at 1071 (noting that the parties agreed that the dosage of sodium pentothal used dur-

ing California executions "would be sufficient to induce unconsciousness, and even cause death itself, if administered properly"); *Evans v. Saar,* 412 F.Supp.2d 519, 521 (D.Md.2006) ("The parties agree that this dosage [3 grams of sodium pentothal], if successfully administered, is enough to drive any human being into deep unconsciousness for hours"); *Abdur'Rahman v. Bredesen,* 181 S.W.3d at 303 ("Dr. Heath agreed that an injection of two grams of sodium pentothal would cause unconsciousness in all but 'very rare' cases and that an injection of five grams of sodium pentothal 'would almost certainly be fatal.' ").

**14.** Curare is a dried extract from a vine used by South American Indians to poison arrow tips and, by doctors, as a muscle relaxant. MERRIAM-WEBSTER ONLINE DICTIONARY (http:// www.m-w.com/cgi-bin/dictionary?book=Dictionary & va=curare) (last visited on May 17, 2006).

**15.** *Beardslee v. Woodford,* 395 F.3d at 1071.

**16.** *Reid v. Johnson,* 333 F.Supp.2d at 547.

**17.** *Beardslee v. Woodford,* 395 F.3d at 1071; *Reid v. Johnson,* 333 F.Supp.2d at 547. "One hundred milliequivalents of potassium chloride is a lethal dose. Within moments after the potassium chloride has been injected, the heart of the inmate will stop beating. Shortly

Applicant points to the fact that numerous states, including Texas, have banned the use of neuromuscular blocking agents such as pancuronium bromide for use in animal euthanasia.[18] These states generally require the use of a single barbiturate, such as sodium pentobarbitol (which is a longer-acting barbiturate than sodium pentothal). Some might conclude that sodium pentobarbitol is a more humane sedative to use in conducting lethal injections because it lasts longer. But applicant has not shown that the massive dose of sodium pentothal used by TDCJ fails to ensure the inmate's unconsciousness. Moreover, because of its infrequent use, pentobarbitol lacks the state-of-the-art scientific analysis regarding its effects and dependability that is available for sodium pentothal. It is not this Court's function to suggest more humane or medically acceptable execution protocol, but to determine whether the method adopted by TDCJ (and used

widely across the United States) is constitutionally sound.[19]

Applicant's argument suggests that if the sodium pentothal does not work, or if it is injected improperly, or if the dosage is not high enough, or if it wore off too soon, he could be conscious at the time that the second injection (of pancuronium bromide) is given and he would suffer great pain, but that pain would be masked because he could not move, speak, or otherwise indicate his suffering. All of these are conceivable possibilities, but they are based upon the assumption that the sodium pentothal injection is ineffective or does not cause a sufficiently long period of unconsciousness (even though it is a fatal dosage).[20]

Courts cannot judge the lethal injection protocol based solely on speculation as to problems or mistakes that *might* occur. Instead, they must examine the lethal injection protocol as it exists today. Appli-

---

thereafter, brain activity will cease. Within three minutes after the injection of the potassium chloride, the inmate will be brain dead." *Id.*

**18.** Florida, FLA. STAT. §§ 828.058 and 828.065; Georgia, GA.CODE ANN. § 4–11–5.1; Maine, ME.REV.STAT. ANN., tit. 17, § 1044; Maryland, MD.CODE ANN., Criminal Law, § 10–611; Massachusetts, MASS. GEN. LAWS ch. 140 § 151A; New Jersey, N.J. STAT. ANN. 4:22–19.3; New York, N.Y. AGRIC. & MKTS LAW § 374; Oklahoma, OKLA STAT. tit. 4, § 501; and Tennessee, TENN.CODE ANN. § 44–17–303. States that require the use of a particular method for animal euthanasia, and therefore implicitly ban the use of neuromuscular blocking agents are: Connecticut, CONN. GEN. STAT. § 22–344a; Delaware, DEL.CODE ANN. tit. 3, § 8001; Illinois, 510 ILL. COMP. STAT. 70/2.09; Kansas, KAN. STAT. ANN. § 47–1718(a); Kentucky, KY.REV. STAT. ANN. § 321.181(17) and KY. ADMIN. REGS. 16:090 section 5(1); Louisiana, LA REV.STAT. ANN. § 3:2465; Missouri, MO.REV.STAT. § 578.005(7); South Carolina, S.c CODE ANN. § 47–3–420; Texas, TEX. HEALTH & SAFETY CODE ANN. § 821.052(a). Most frequently, these

states require either the use of the sedative sodium pentobarbitol, or adherence to the American Veterinary Medical Association Panel on Euthanasia's published method.

**19.** *See Reid v. Johnson,* 333 F.Supp.2d at 547–48.

**20.** *See Sims,* 754 So.2d at 666 n. 17 (noting that "[o]n the issue of dosage, a defense expert admitted that only one milligram per kilogram of body weight is necessary to induce unconsciousness, and that a barbiturate coma is induced at five milligrams per kilogram of body weight. Thus, two grams of sodium pentothal (i.e., 2000 milligrams) is a lethal dose and certain to cause rapid loss of consciousness (i.e., within 30 seconds of injection). The expert further stated that muscle paralysis occurs at .1 milligram of pancuronium bromide per kilogram of body weight. Thus, fifty milligrams of pancuronium bromide far exceeds the amount necessary to achieve complete muscle paralysis. Finally, the expert admitted that 150 to 250 milliequivalents of potassium chloride would cause the heart to stop if injected quickly into the in-

cant has provided no evidence that the TDCJ protocol is subject to any realistic risk of unnecessary pain or suffering. The Supreme Court of Connecticut has reached the same conclusion:

> The defendant's argument is premised on a series of presumptions: that the personnel will not be trained adequately; that the dosage of thiopental sodium ten times the surgical dose will not be sufficient to render the inmate unconscious; and that the agents will not be administered in the proper time and sequence. The evidence, however, supports a conclusion that reasonable steps have been taken to eliminate human error.... We conclude ... that the agents may be administered correctly and effectively, and that the possibility of a "botched" execution is extremely remote under the protocol.[21]

The risk of accident or negligence "cannot and need not be eliminated from the execution process" for that method to survive constitutional review.[22] Those courts that have considered the issue of the lethal injection drug protocol have found that the likelihood of constitutional error occurring "is so remote as to be nonexistent." [23]

In sum, applicant has failed to produce any facts or scientific evidence that a scenario involving unnecessary pain and suffering by the use of TDCJ's chemical protocol is anything other than speculation. I therefore join in the Court's decision to lift the temporary stay of execution and to the dismissal of applicant's subsequent petition for failing to make a prima facie showing of possible merit.

PRICE, J., filed a dissenting statement in which HOLCOMB, J., joined.

On May 15, 2006, this Court stayed the applicant's imminent execution in order to allow time to consider what he styles a subsequent post-conviction application for writ of habeas corpus brought pursuant to Article 11.071, Section 5(a) of the Texas Code of Criminal Procedure.[1] In his purported subsequent writ application, the applicant alleges that the particular three drug protocol for executing capital offenders in Texas violates the Eighth Amendment ban ˙ on cruel and unusual punishments. It has long been my position that such a claim satisfies the criteria for a subsequent writ application under Article 11.071, section 5(a).[2]

Today the Court has lifted O'Brien's stay, and has denied a stay of execution to a second applicant who has raised a claim identical to O'Brien's, and who is scheduled to be executed this evening. In her concurring statement, Judge Cochran ultimately concludes that the applicant has failed to allege facts sufficient to make out a *prima facie* case for establishing an Eighth Amendment violation. But of course, that is not the question before us. Under Article 11.071, Section 5(a), the question before us is whether the current claim has not been and could not have been presented previously in a timely initial post-conviction writ application because the factual or legal basis for the claim was unavailable when the previous application was filed. The applicant has alleged an Eighth Amendment violation. Whether the facts he has stated in support of that claim would, if true, entitle him to

mate and that an IV push would qualify as 'quickly.' ").

**21.** *Webb,* 750 A.2d at 456.

**22.** *Campbell v. Wood,* 18 F.3d 662, 687 (9th Cir.1994).

**23.** *Reid,* 333 F.Supp.2d at 551.

**1.** Tex.Code Crim. Pro. art. 11.071, § 5(a).

**2.** See *Ex parte Hopkins,* 160 S.W.3d 9 (Tex. Crim.App.2004) (Price, J., dissenting to denial of stay of execution).

relief, is a question in the first instance for the convicting court to resolve,[3] in the event we decide the criteria of Section 5(a) have been satisfied. All we are authorized to decide at this juncture is whether those facts were previously "unavailable," as that term is defined in Article 11.071, Section (5)(e) of the Code of Criminal Procedure.[4]

On the other hand, there may be a legitimate question whether a challenge to the lethal injection protocol actually constitutes a post-conviction application for writ of habeas corpus *at all*, under Article 11.071, since it may not constitute a challenge to "a judgment imposing a penalty of death."[5] We originally granted the stay in this cause, by my understanding, in order to allow ourselves sufficient time to decide whether a claim such as the applicant's challenge to the lethal injection protocol may even be brought under Article 11.071, and whether, if a post-conviction challenge under that specific provision is *not* appropriate, any other extraordinary remedy may be available for the applicant to present his challenge. It has long been the practice of this Court not to be bound by the denomination of a pleading for extraordinary relief, but to issue whatever remedy may be appropriate in light of the *substance* of the pleading.[6]

Nobody doubts that whether Texas's three drug protocol violates the Eighth Amendment is a substantial and troubling question, one that even a casual perusal of Judge Cochran's concurring statement demonstrates is presently vexing courts all over the country. If there exists a legiti-

mate vehicle for a condemned inmate to bring that issue before us, even at the eleventh hour, surely we should address it on the merits. But it is incumbent upon us first to decide whether such a vehicle does exist. That was the impetus behind our granting the applicant's stay.

Today, instead, the Court rushes to judgment, apparently *assuming* (at least judging by Judge Cochran's concurring statement) that the applicant's claim is legitimately before us as a subsequent post-conviction habeas corpus, but leaping to a premature conclusion with respect to the merits of the Eighth Amendment issue. Moreover, in rejecting the claim on the merits, the Court (again via Judge Cochran) apparently concludes that the applicant "has failed to produce any facts or scientific evidence" to support his claim. It is manifestly unfair, in my estimation, to fault the applicant for a failure of proof without first affording him an opportunity to present evidence at a hearing, or through one of the other mechanisms that the statute allows for presentation of evidence, once it is determined that facts have been *alleged*, which, if true, may entitle the applicant to relief.[7] It is not clear to me that the lethal injection protocol we use in Texas to execute capital offenders does *not* constitute cruel and unusual punishment. It is evident enough from the applicant's pleadings that it *might*. I would not reject the applicant's claim (assuming we can reach it) without affording

---

**3.** *See Ex parte Simpson*, 136 S.W.3d 660, at 668–69 (Tex.Crim.App.2004) ("We are not the convicting court, and we are not the original factfinders.")

**4.** TEX.CODE CRIM. PRO. art. 11.071, § (5)(e).

**5.** *See Ex parte Kerr*, 64 S.W.3d 414, at 418 (Tex.Crim.App.2002) (quoting TEX.CODE CRIM. PRO. art. 11.071, § 1).

**6.** *See e.g., Houlihan v. State*, 579 S.W.2d 213, at 216 (Tex.Crim.App.1979) ("Nor ... does the form in which the matter is originally presented control the form of writ by which the matter is disposed.").

**7.** TEX.CODE CRIM. PRO. art. 11.071, § 9(a).

the applicant an evidentiary forum to substantiate his claim.

For all of these reasons, I respectfully dissent to the order of the Court lifting the applicant's stay of execution.

JOHNSON, J., filed a dissenting statement.

This case presents questions about what legal procedures are appropriate for challenging the execution protocol.

> Are the provisions of Article 11.071 the proper vehicle to challenge the constitutionality of the execution protocol used in conducting an execution in Texas? If not, what is the proper vehicle?
> What is the proper legal method for presenting facts regarding and challenging the execution protocol used in conducting an execution in Texas?

Analogous procedural issues in the federal system are under review in *Hill v. Crosby,* — U.S. ——, 126 S.Ct. 1189, 163 L.Ed.2d 1144 (2006)(argued and pending decision). The underlying issue of the execution protocol is the same in this case as in *Hill.*

The issue of the proper legal procedure for challenges to execution protocols must be addressed at some point. We very recently said, albeit in an unpublished opinion, that a challenge is not ripe until the execution is "imminent." *Doyle v. State,* No. 74, 960 2006 WL 1235088, 2006 Tex.Crim.App. LEXIS 925 (Tex.Crim. App., delivered May 10, 2006). "Imminent" means "likely to occur at any moment; impending." Webster's Encyclopedic Unabridged Dictionary of the English Language (Gramercy Books 1989). The concurrence says that the challenge is ripe once a death date is set, although the Court has not said that. Death dates are set months in the future and so are not "imminent" when set. If both positions are taken as authoritative, both the applicant and the Court are caught in a Catch–22; the challenge cannot be raised or heard until it is "imminent," yet it must be raised and heard as soon as the death date is set. Thus these important issues can never be reviewed.

Accepting arguendo that the current mixture of drugs does not violate constitutional protections, the issue must still be addressed. We cannot say that the protocol will never change. A different protocol may indeed violate constitutional guarantees. We will be then faced with the same legal issues we face today, and they will still be unresolved and unresolvable because such challenges will always be both unripe and over-ripe.

I respectfully dissent.