408 F.3d 1027
 Vernon BROWN, Appellant,
v.
Larry CRAWFORD; James D. Purkett, Superintendent, Missouri Eastern Reception Diagnostic & Correctional Center; Does 1-666, Anonymous Executioners, Appellees.
 No. 05-231-.
 United States Court of Appeals, Eighth Circuit.
 Submitted: May 16, 2005.
 Filed: May 17, 2005.
 
 Appeal from the United States District Court for the Eastern District of Missouri.
 Richard Holland Sindel, Sindel & Sindel, Clayton, MO, John William Simon, St. Louis, MO, for Appellant.
 Stephen David Hawke, Andrew William Hassell, Attorney General's Office, Jefferson City, MO, for Appellees.
 Before BYE, BOWMAN and BEAM, Circuit Judges.
 PER CURIAM.
 
 
 1
 This matter comes before the court on Appellant's motion for a stay of execution of a sentence of death. The court has carefully considered the motion and the Appellees' response, and the motion is denied. It is further ordered that the appeal is dismissed.
 
 
 2
 BYE, Circuit Judge, dissenting.
 
 
 3
 I respectfully dissent from the order denying Vernon Brown's motion for a stay of execution pending this appeal.
 
 
 4
 Brown challenges the chemical protocol used by Missouri to carry out lethal injections. He contends the three-chemical sequence used by Missouri—sodium pentothal, pancuronium bromide, and potassium chloride—creates a foreseeable risk of the gratuitous infliction of unnecessary pain and suffering in violation of the Eighth Amendment.
 
 
 5
 I briefly summarize what this record shows about the chemical protocol used by Missouri to carry out lethal injections. The first drug administered is sodium pentothal, a barbiturate sedative used to induce unconsciousness. The second drug administered is pancuronium bromide, a paralytic agent. Pancuronium bromide causes the person to whom it is administered to suffocate, eventually, because the lungs stop moving; at the same time, the drug's paralytic effect prevents the person from manifesting this suffering, or any other sensation, by facial expression, hand movement, or speech. The third drug administered is potassium chloride. Potassium chloride burns intensely as it goes through the veins toward the heart. When potassium chloride reaches the heart, it induces a heart attack.
 
 
 6
 In this action under 42 U.S.C. § 1983, Brown contends the state—before executing him—should be required to demonstrate the levels of sodium pentothal it administers are sufficient to render him unconscious throughout the execution, and the personnel who administer the three-drug protocol are sufficiently trained to administer it correctly. For if the sodium pentothal has not done its job (i.e., rendered a state of unconsciousness) when the potassium chloride takes effect, Brown will feel the excruciating pain caused by that drug, and the pain of the heart attack. In addition, because the state administers pancuronium bromide as a paralytic agent, no one will be able to tell whether Brown is conscious and therefore experiencing gratuitous pain because his entire body will be paralyzed so that he cannot express himself in any way. The possibility of gratuitous suffering through the use of this three-chemical protocol is enhanced by the fact sodium pentothal precipitates when it is exposed to pancuronium bromide, that is, it loses it effectiveness as an anesthetic. In other words, the use of this three-chemical sequence results in a possibility the person to whom it is administered will be conscious when the inherently painful potassium chloride takes effect, yet no one will know because of the paralytic effects of the pancuronium bromide.
 
 
 7
 "It is undisputed that `substantial pain and suffering can occur when the inmate receives an inadequate dosage of sodium pentothal and therefore retains consciousness and sensation during the injection of the second and third chemicals.'" Beardslee v. Woodford, 395 F.3d 1064, 1074 (9th Cir.2005) (quoting Deborah W. Denno, Getting to Death: Are Executions Constitutional?, 82 Iowa L.Rev. 319, 380 (1997)). The possibility of such cruel, conscious suffering has resulted in nineteen states passing laws "banning, in whole or in part, the use of neuromuscular agents as a means of euthanizing animals." Id. at 1071. As Brown's district court pleadings indicate, Missouri is "using a combination of chemicals they knew or should have known would cause an excruciating death when they were telling the public it was like putting a dog to sleep, when their own veterinarians would lose their licenses for using the same chemicals on a stray." Brown v. Crawford, No. 4:05-CV-746-CEJ, Motion for Temporary Restraining Order at 19. Brown contends there are alternative chemical protocols—for example, a lethal dose of pentobarbital—Missouri could use to carry out an execution without unnecessarily inflicting gratuitous pain and suffering.
 
 
 8
 Brown's § 1983 action is based in part upon a recently-published article. See L.G. Koniaris, M.D., Inadequate anaesthesia in lethal injection for execution, 365 The Lancet 1412 (Apr. 16, 2005). This article appears to be the first published empirical research showing the three-chemical process used by some states to carry out lethal injections has the possibility of causing unnecessary cruelty and suffering. The study outlined in the article analyzed autopsy toxicology results from forty-nine executions carried out in Arizona, Georgia, North Carolina and South Carolina. The authors conclude in twenty-one of those cases—or 43%—the post-mortem levels of thiopental (sodium pentothal) were consistent with consciousness. In other words, the deceased was likely conscious when the potassium chloride was administered.
 
 
 9
 In support of his motion for a temporary restraining order, Brown submitted the declarations of Dr. David Lubarsky and Dr. Mark Heath. Lubarsky was one of the authors of the article in The Lancet. Notably, Lubarsky averred that "[e]ach of the propositions of fact set forth in the LANCET article as aforesaid reflects my opinion to a reasonable degree of scientific certainty." Lubarsky Decl. at 3.
 
 Lubarsky's declaration further indicated:
 
 10
 Based on our research, the article concluded that toxicology reports from the four lethal-injection jurisdictions which provided them showed that postmortem concentrations of thiopental (sodium pentothal) in the blood of persons who had been executed were lower than that required for surgery in 43 of 49 cases reported (88%) and 21(43%) inmates had concentrations consistent with awareness.
 
 
 11
 . . . .
 
 
 12
 On the basis of the data which ... the State of Missouri has provided, and from the fact that according to these data, the procedure in Missouri is not substantially dissimilar to the procedure in the states which kept and provided toxicology data, I draw the inference, to a reasonable degree of medical certainty, that the levels of thiopental (sodium pentothal) in the bloodstreams of persons executed by lethal injection in Missouri are, at best, similar to those levels executed in the four states which kept and provided toxicology data.
 
 
 13
 Id. at 4.
 
 
 14
 Dr. Lubarsky then goes on to list the data the State of Missouri would have to provide for him to rule out the possibility that Missouri's execution protocol is insufficient to produce unconsciousness throughout an execution. Id. at 5-9.
 
 
 15
 Similarly, Dr. Heath, a board-certified anesthesiologist, filed a declaration in this action in which he states:
 
 
 16
 Based on the information the [defendants] have chosen to release [in a separate death penalty matter], it is my opinion to a reasonable degree of medical certainty that the defendants' lethal injection practices create a foreseeable risk that the plaintiff/petitioner will not be anesthetized to the point of being unconscious and unaware of the pain for the duration of the execution procedure, when this risk is absolutely unnecessary to the statutory purpose of bringing about the death of the plaintiff/petitioner.
 
 
 17
 Heath Decl. at 18-19.
 
 
 18
 Significantly, at this point the record does not show the dosage of sodium pentothal used by Missouri. The record does not show the qualifications of those administering Missouri's three-drug protocol. Missouri has not countered Brown's medical evidence with any medical evidence of its own, but rather relied solely on procedural and legal defenses to this action. The state's failure to counter Brown's medical evidence leaves Brown's evidence uncontroverted. Thus, this case is unlike those in which similar challenges to this three-drug protocol were rejected, because in those cases the state presented medical evidence to counter the prisoner's claim he would be conscious and suffer extreme, unnecessary pain during an execution. See Beardslee, 395 F.3d at 1075 (discussing the opinion of the state's expert setting forth the sodium pentothal dosage level used by California and the minimal chances a person would be conscious with-in sixty seconds from the start of the administration of that dosage level); Reid v. Johnson, 333 F.Supp.2d 543, 546-47 (E.D.Va.2004) (discussing dosage level of sodium pentothal used by Virginia and the minimal chances of an inmate regaining consciousness within ten minutes). On the current state of this record, where the State of Missouri has not presented any evidence to counter Brown's medical evidence, I believe it is clear Brown is entitled to a stay of his execution. See Reid v. Johnson, 105 Fed. Appx. 500, 502 (4th Cir.2004) (granting a stay of execution in case involving Virginia's three-chemical execution protocol, and remanding to the district court for a consideration of the merits of inmate's claim).
 
 
 19
 One of the procedural arguments the state made in this case, and with which the district court agreed, was the claim Brown failed to exhaust his administrative remedies prior to filing this action. I disagree. The record in this case shows there was no administrative process available to Brown to grieve this particular claim.
 
 
 20
 In the case of Johnston v. Kempker, No. 4:04-CV-1075DJS (E.D.Mo.), inmate Timothy Johnston raised the same claim raised in this case, that is, a challenge to the three-drug protocol used by Missouri to carry out lethal injections. Johnston attempted to exhaust his administrative remedies regarding the claim by taking the first step in the Missouri Department of Corrections inmate grievance procedure, that is, he filed an Informal Resolution Request (IRR) with the proper authorities at the institution where he was incarcerated. The response Johnston received was that a challenge to the chemical protocol used to carry out an execution was "a non-grievable issue per D5-3.2."
 
 
 21
 Death penalty counsel in this case relied upon the "non-grievable" position the state took in the Johnston case to contend there are no administrative remedies to exhaust in this case. In an abundance of caution, however, Brown filed an IRR challenging the three-chemical protocol. Unlike Johnston, who was told his claim was "non-grievable," the state informed Brown:
 
 
 22
 [Y]our proposed action of delaying all executions cease (sic) while the method of execution is examined is outside the scope of our responsibility and authority. Execution procedure is determined at a level outside this institution and therefore ERDCC is unable to address your complaint. Should you wish to pursue the matter further, we suggest persisting to the grievance appeal level where the issue can be effectively reviewed. Therefore your IRR is denied.
 
 
 23
 It is undisputed Brown did not pursue the matter further than the initial IRR.
 
 
 24
 On May 13, 2005, the district court held a hearing on Brown's motion for a temporary restraining order in this action. During the hearing, the issue of exhaustion of administrative remedies was discussed at some length. The state represented the complete exhaustion of administrative remedies requires three steps: 1) the filing of an IRR, 2) the filing of a grievance, and 3) the filing of a grievance appeal. T.R.O. Hr'g Tr. at 60. The state further represented the grievance is filed with the superintendent of the institution where the prisoner is incarcerated, and the grievance appeal is addressed by "the central office," that is, the Director of the Department of Corrections. Id. at 61-62.
 
 
 25
 The state conceded the corrections classification worker who would address the initial IRR has no authority to change the lethal injection protocol. Id. at 61. The state further conceded the superintendent of the institution where the prisoner is incarcerated has no authority to change the protocol for the lethal injection. Id. The state admitted the only person with authority to change the protocol would be the Director of the Department of Corrections. Id. at 62. Significantly, when asked whether an inmate had the ability to bring an initial grievance before the Director, the state conceded there was no procedure for that:
 
 
 26
 THE COURT: Okay. Could Mr. [Brown] have bypassed the IRR procedure and the grievance? Since it is clear that no one at the institution had authority to make any changes, could he have bypassed the institutional officials and gone directly to the director with his complaint?
 
 
 27
 MS. McElvein: No, your Honor. Not that I am aware of.
 
 
 28
 Id. at 62-63.
 
 
 29
 I believe the state's concession on this point conclusively demonstrates there was no administrative process available to Brown to grieve this particular claim. The Director's role in the normal administrative process is to function as an appellate body, reviewing the disposition of the grievance filed with the superintendent of the institution where the prisoner is incarcerated. In this case, the state concedes the superintendent had no authority—no jurisdiction if you will—to change the protocol for lethal injections. Thus, as the appellate body reviewing any decision made by the superintendent, the only role the Director would serve would be to determine whether the superintendent correctly determined he had no authority to change the protocol.
 
 
 30
 There is a fundamental difference between reviewing a decision as an appellate body, and making the initial decision; a difference as fundamental as that between the original jurisdiction enjoyed by district courts over actions filed in federal court and the appellate jurisdiction exercised by the courts of appeals. Thus, the Director's appellate role in the normal administrative process cannot serve as the functional equivalent of its role as the initial decision-maker. Here, the state concedes there was no administrative procedure available to allow the Director to function in the role of the initial decisionmaker, rather than in the role of an appellate body reviewing a decision which the superintendent had no authority to make.
 
 
 31
 For the above reasons, I respectfully dissent from the order denying Vernon Brown's motion for a stay of execution pending this appeal.