IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-36,142-03






EX PARTE JESUS LEDESMA AGUILAR, Applicant
 





ON APPLICATION FOR WRIT OF HABEAS CORPUS


IN CAUSE NO. 95-CR-1088 FROM THE 


107TH DISTRICT COURT OF CAMERON COUNTY





 Cochran, J., filed a concurring statement, in which Hervey, J., joined.


CONCURRING STATEMENT 



 I respectfully concur in the Court's action dismissing the subsequent application for
a writ of habeas corpus.

 Regardless of the appropriate procedure that might apply to claims of this nature,
applicant has failed to make a prima facie showing that the lethal injection protocol used by
the Texas Department of Criminal Justice (TDCJ) creates such a risk of unnecessary pain or
suffering that its use must be declared unconstitutional. He has failed to show any reasonable
likelihood of success on either the law or the facts. 

 As was true in Ex parte O'Brien, (1) applicant in this case has failed to show that any of
the 37 states that currently use lethal injection have found that it causes unconstitutionally
wanton and unnecessary pain:

 Of the thirty-eight states that presently permit capital punishment,
approximately thirty-seven of them have adopted lethal injection as the
primary means of execution. Almost every single one of those states uses
the same three chemicals as TDCJ. Moreover, I am unable to find any court
that has held that lethal injection in general, or a specific lethal-injection
protocol in particular, violates the Eighth Amendment. (2)


Applicant thus fails to provide a legal basis for his constitutional claim.

 Turning to the factual basis, applicant has provided this court with a number of
exhibits and anecdotal examples which purport to demonstrate a scientific basis for his claim. 
One of applicant's exhibits states, "[w]hen analyzing a particular method of execution or the
implementation thereof, it is appropriate to focus 'on the objective evidence of the pain
involved.'" (3) Applicant's exhibits and examples, however, do not set out any objective
evidence of a reasonable risk of unnecessary or wanton pain in the TDCJ protocol.

 Applicant's primary scientific exhibit is a research letter (4) entitled "Inadequate
Anaesthesia in Lethal Injection for Execution," that appeared in the British medical journal,
The Lancet, in April, 2005. This letter/article has been noted by several different courts that
have rejected claims similar to applicant's. (5) 

 There are serious problems with this letter. First, it is published under the heading
"Research Letters." Thus, it is akin to a Letter to the Editor about an ongoing research
project and makes no claim to be a peer-reviewed scientific study. Second, it states that the
idea for the letter, the protocol information, and the data all came from "J.P. Shelden" whom
the article notes is "an attorney who represents inmates sentenced to death." (6) An article
conceived by and based upon data supplied by an attorney who sole scientific credential is
that he represents death row inmates is hardly a mark of scientific objectivity. Third, the
suggested conclusion is so extraordinary that it challenges simple logic. 

 The authors posit that post-mortem concentrations of thiopental (also known as
sodium pentothal) in 43 out of 49 executed inmates were lower than that required for a
surgically sound level of unconsciousness. They also posit that, based upon their post-mortem data, 21 out of the 49 inmates would have been conscious at the time the final drug
was administered. That is, over 85% of the time the fatal dose of sodium thiopental did not
cause even a deep level of unconsciousness, and, over 40% of the time, it was totally
ineffective. Either the use of sodium pentothal as an anaesthetic in the lethal injection
process is an utter fraud and delusion, or this study is fundamentally flawed. 

 Because this habeas corpus application, like so many throughout the nation, is brought
at the eleventh hour, the State has not had the opportunity to respond with its own scientific
information. To a layman, however, one explanation for the peculiar results in this study is
that the authors may not be comparing apples to apples. The article suggests that it compared
the levels of sodium thiopental in the blood of those undergoing surgery with the post-mortem levels of sodium thiopental found during same-day or next-day autopsies of executed
inmates. This assumes that the level of sodium thiopental in the body remains constant both
during its surgical use as an anaesthetic and as a post-mortem residue. But if part of the
value of sodium thiopental is that it is ultra fast-acting and then wears off very rapidly, a
layman might well conclude that the fact that little sodium thiopental residue is found during
post-mortem autopsies is because it had worn off and dissipated. (7) Absent scientific
confirmation by studies compiled and conducted by objective scientists, this study raises
questions but provides no answers.

 Applicant also relies upon an affidavit submitted by Dr. Mark Heath in a California
federal district court. (8) Dr. Heath has testified in numerous cases claiming that the lethal
injection protocol in various states creates a risk of unnecessary pain and suffering. (9) Dr.
Heath states that "[f]ive grams of sodium thiopental is a massive, and potentially lethal,
dose," (10) and "[w]hen successfully delivered into the circulation in sufficient quantities,
sodium thiopental causes sufficient depression of the nervous system to permit excruciatingly
painful procedures to be performed without causing discomfort or distress." (11) That is, if the
sodium thiopental is properly administered, the process works without pain. But Dr. Heath
notes that potential problems exist in the delivery of that anaesthetic during the execution
process:

 * Errors in preparation; the person who mixes the powdered sodium thiopental
might not mix the right amount into the solution;

 * Errors in labeling; the person who labels the different lethal injection syringes
might mislabel them;

 * Errors in selecting the correct syringe: the person injecting the drugs might use
the wrong syringe at the wrong time;

 * Errors in correctly injecting the drug into the intravenous line; the person
injecting the drugs into the IV might inject the drug into the IV fluid bag
instead of the inmate;

 * The IV tubing might leak;

 * Incorrect insertion of the catheter; the person putting the catheter into the
inmate might not insert it into a vein, allowing the drug to infiltrate the tissues;

 * Migration of the catheter; the catheter could move out of the vein during the
process;

 * Perforation or rupture or leakage of the vein; the catheter might stay in place,
but the inmate's vein might burst and cause infiltration of the drugs into the
surrounding tissue;

 * Excessive pressure on the syringe plunger; the person injecting the drugs might
push too hard, causing the vein to rupture;

 * Securing the catheter; the catheter might come loose during the process if it is
not taped properly;

 * Failing to properly administer flush solutions between injections of drugs; the
drugs might precipitate out of solution if the catheter is not flushed with saline
solution between the three different drugs;

 * Impaired delivery due to restraining straps; the inmate's restraining straps
might be so tight that they act as a tourniquet preventing a proper flow of the
drugs through the body.


All of these are potential problems during the lethal injection protocol, just as they are
potential problems during any surgical procedure. As a society, however, we do not ban
surgery because of these potential problems. We take appropriate precautions and rely upon
adequate training, skill, and care in doing the job. As any doctor, nurse, or medical
malpractice lawyer can attest to, mistakes and misfortunate incidents do occasionally occur
during medical procedures. But the fact that possible problems might occur during any
surgical procedure does not necessarily mean that there is an unreasonable risk of misfortune
in a particular procedure undertaken by particular personnel. We assume that trained
personnel will perform adequately and take appropriate precautions unless and until it is
proven otherwise. (12) Dr. Heath suggests that the procedure should be performed by and
reviewed by doctors. But there is no showing that doctors routinely prepare fluids for
injection, insert or monitor IV lines in hospital surgeries. Anecdoctal evidence suggests that
medical technicians or nurses routinely perform these tasks. 

 What evidence does applicant produce to support a conclusion that TDCJ's specific
practice and procedures create an unnecessary risk of great pain and suffering during the
lethal injection process? A few anecdotes. He points to eight inmates who were executed
in Texas between 1985 and 1998. In four of those eight cases (one each in 1985, 1986, 1987
and 1992), the technicians could not immediately find a suitable vein. Unfortunately, this
is a common occurrence for anyone who has had a catheter inserted. The likelihood of this
problem increases for those who have had numerous injections- such as former drug addicts
or diabetics-and when one is nervous. According to Dr. Heath, the natural anxiety and
tension an inmate experiences prior to the procedure increases the likelihood of difficulty
inserting a catheter. (13) In one 1988 instance, the catheter came out of the inmate's vein,
"spraying the chemicals across the room toward the witnesses." In a 1998 case, the catheter
came out of the inmate's collapsed vein before the first drug was administered and it had to
be reinserted. Indeed, these are both most unfortunate incidents, but this problem
occasionally occurs during routine surgeries also. In both a 1989 and a 1998 incident, the
inmate's chest heaved, and he gasped and choked during the procedure. But there is no
indication whether these two instances were the result of an involuntary physical reflex or
a conscious or semi-conscious reaction to the drugs. (14) Considering that 364 inmates have
been executed under the present protocol, the fact that eight of those
executions-approximately 2%-have not proceeded flawlessly is a quite respectable result. 
One wonders how this compares to the percentage of comparable problems in hospital
surgeries. 

 Even if one chooses to call these eight anecdotal incidents "botched" executions, a 2%
"botch" rate does not raise a reasonable risk that the TDCJ lethal injection protocol violates
the Eighth Amendment.

 The American Veterinary Medical Association Report that applicant relies upon

 summarizes contemporary scientific knowledge on euthanasia in animals and
calls attention to the lack of scientific reports assessing pain, discomfort, and
distress in animals being euthanized. Many reports on various methods of
euthanasia are either anecdotal, testimonial narratives, or unsubstantiated
opinions and are, therefore, not cited in this report. (15)


Further scientific research on animal euthanasia may lead to further scientific research on
lethal injection protocols. But until scientific reports-not anecdotes, testimonial narratives,
and scientifically unsubstantiated opinions-indicate that the current TDCJ execution protocol
raises an unreasonable risk of constitutionally unnecessary pain and suffering, I can see no
jurisprudential value in granting a last-minute stay of execution to consider either the merits
of the claim or the proper procedure for bringing such a claim.

 With these comments, I concur. 

Filed: May 22, 2006

Do Not Publish 
1. No. WR-51,264-03, 2006 Tex. Crim. App. LEXIS 976 (Tex. Crim. App., May 17, 2006)
(Cochran, J., concurring).
2. Id. at *7 (footnotes omitted).
3. Morales v. Hickman, 415 F. Supp. 2d 1037, 1039 (N.D. Cal. 2006) (quoting Fierro v.
Gomez, 77 F.3d 301, 306 (9th Cir. 1996).
4. The document is described as a "letter" in the April 13, 2005, University of Miami press
release announcing its forthcoming publication in The Lancet. 
http://www.fadp.org/pressrel127.html (last visited on May 22, 2006). 
5. See, e.g., Rutherford v. Crosby, 438 F.3d 1087, 1094 (11th Cir. 2006), stay granted, 126
S.Ct. 1191 (2006); Hill v. State, 921 So.2d 579, __ (Fla. 2006) ("This [Lancet] study does not
justify an evidentiary hearing in this case"); Brown v. Crawford, 408 F.3d 1027, 1028 (8th Cir.
2005) (dismissing motion for a stay of execution despite the fact that the inmate based his claim
under 42 U.S.C. § 1983 in part on The Lancet article); Bieghler v. State, 839 N.E.2d 691, 695
(Ind. 2005) (finding the Lancet study was not sufficient to establish "a reasonable possibility that
Indiana's method of execution violates the federal or state constitution").
6. Leonardis G. Koniaris, Teresa A. Zimmers, David Lubarsky, & Jonathan P. Shelden,
Inadequate Anaesthesia in Lethal Injection for Execution, 365 Lancet 1412, 1414 (April 16,
2005).
7. The authors of the letter admit that "[e]xtrapolation of antemortem depth of anaesthesia
from post-mortem blood thiopental concentrations is admittedly problematic." Id. at 1413. They
cite two specific reasons for this problem: (1) they cannot estimate concentrations of thiopental
in the brain (post-mortem) from concentrations in the blood (during surgery) without knowing
details of the rate and duration of the administration of the drug; and (2) there is no known data
about post-mortem distribution of thiopental. Id. These are not insignificant problems, and one
wonders how even an educated guess could be made without sufficient underlying data to make
an apples-to-apples comparison. Perhaps the authors realized the deficiencies of their study
when they concluded, "Failures in protocol design, implementation, monitoring and review might
have led to the unnecessary suffering of at least some of those executed." Id. at 1414. But if
their data has any validity, the use of sodium thiopental as a part of the execution protocol led to
horrendous suffering by, at a minimum, over 40% and to some level of suffering by more than
85%. Scientific studies that raise radically new hypotheses and appear to be based upon adequate
data are generally replicated within weeks or months and confirmed or dispelled. So it was with
the "cold fusion" hoax, the power-line cancer-causing radiation scenario, and the Bendectin
scare. In the meantime, objective scientists await further study before reaching any conclusions,
even tentative ones.
8. Declaration of Dr. Mark Heath, Morales v. Hickman, 415 F. Supp.2d at 1045.
9. Dr. Heath states that "as a result of concerns about the mechanics of lethal injection as
practiced in the United States, I have performed many hundreds of hours of research into the
techniques that are used during this procedure." Declaration at 2. He states that he has testified
in Maryland, Georgia, Tennessee, Kentucky, Virginia, and Louisiana courts on this issue. 
Despite Dr. Heath's testimony, none of those courts have found that the lethal injection protocol
in their states violates the constitution.
10. Declaration at 4.
11. Id. at 9.
12. Applicant complains that he "does not know what the qualifications of the 'designated
staff' who must ensure the integrity of the chemicals are, and the protocol is completely silent
with respect to who actually 'prepares' the syringes for each injection." True enough, but how
many surgery patients know the qualifications of the technician who draws their blood and
prepares syringes for surgery? In both hospitals and prisons, the presumption is that the
personnel is qualified and trained unless the opposite is shown.
13. Id. at 20 ("[w]hile speculative and not evidence-based, it is my opinion that it is likely
that IV placement is rendered more difficult in the context of executions because the inmates are
often in a very anxious status, which causes the release of epinephrine (adrenalin) and
norepinephrine, thereby causing constriction (narrowing) of blood vessels (including veins). 
When veins are constricted/narrowed it can be difficult or impossible to insert an IV catheter"). 
In other words, the fault lies not with the skill and training of the technician, but with the inmate.
14. The 2000 Report of the AVMA Panel on Euthanasia issued by the American Veterinary
Medical Association that applicant includes as an exhibit to his application, notes that "[a]n
aesthetically objectionable gasp may occur in unconscious animals" that are euthanized by
injecting barbiturates. 2000 Report of the AVMA Panel on Euthanasia, 218 JAVMA 669, 680
(March 1, 2001). The report states that, prior to the procedure, owners should be warned that
"[b]ehaviors such as vocalization, muscle twitches, failure of the eyelids to close, urination, or
defecation" might occur during euthanasia and "can be distressing." Id. at 674. Furthermore, the
use of potassium chloride as a part of the euthanasia protocol may cause "[r]ippling of muscle
tissue and clonic spasms . . . on or shortly after injection." Id. at 681. But this is an involuntary
reflex, and if the animal is unconscious, he suffers no pain.

 Applicant offers this report to show that "not even a dog" could be euthanized under the
TDCJ protocol using pancuronium bromide. Indeed, the report states, "A combination of
pentobarbital with a neuromuscular blocking agent [such as pancuronium bromide] is not an
acceptable euthanasia agent." Id. at 680. The report does not expressly explain why it reaches
that conclusion, but other portions of the report note that "agents that induce muscle paralysis
without loss of consciousness are not acceptable as sole agents for euthanasia (eg, depolarizing
and nondepolarizing muscle relaxants, strychnine, nicotine, and magnesium salts)." Id. at 675. 
This is because such agents cause loss of motor activity before loss of consciousness. See id. 
Lack of motor activity does not mean an absence of distress. Id. 
15. AVMA Report at 688.